1

2    Christine Chang Pro Per, Individually
     And Eric Sun, disabled

3    341 Tideway Drive #214
     Alameda, CA 94501

4    Telephone: (510) 769-8232

5

6

7                        FILED

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10   CHRISTINE CHANG, individually  )    Case No: C-07-4005 EMC
     And ERIC SUN, disabled          )

11                                    )    MEMORANDUM OF POINTS AND
            Plaintiffs,               )    AUTHORITIES IN SUPPORT OF

12                                    )    APPOINTMENT OF COUNSEL
            vs.                       )    FOR GUARDIAN AD LITEM

13                                    )    FOR DISABLED PLAINTIFF SUN
     ROCKRIDGE MANOR                  )    AND LEAVE TO FILE SUPPORTING

14   CONDOMINIUM et al.               )    DOCUMENTS
                                      )

15          Defendants.               )
                                      )

16                                    )    Date:  April 23, 2008
                                      )    Time: 10:30 a.m.

17                                    )    Courtroom: C, 15th Floor
                                      )    Judge: Honorable

18                                    )         Edward M. Chen

19

20                    __INTRODUCTION__

21       Plaintiff Sun is a disabled adult with mental illness of Schizophrenia Paranoid

22   Type (295.30) and as such, lacks the legal and mental capacity to represent himself.

23   The court proceedings will cause his symptoms to become worse due to his fear of people

24                              1

1   and unable to withstand pressure. Plaintiff Sun was working at the Oakland Downtown

2   YMCA as a towel clerk and taking care of himself and his pet before the Rockridge Manor

3   Condominium Defendants summoned the John George Crisis Center and Oakland police

4   framing him being dangerous and violent and having a gun. Immediately after the incident

5   Plaintiff Sun's symptom worsened losing his ability to leave home and to take public

6   transportation to and from work.

7        Moreover, the Rockridge Manor Condominium Defendants caused the assault/battery

8   Defendant Constance Pepper Celaya to beaten disabled Plaintiff Sun while these Defendants

9   were fully aware of Plaintiff Sun's physical and mental impairments. Immediately after the

10  assault/battery incident Plaintiff Sun's symptom became severe. Because these Defendants'

11  continuous persecution and stalking in the Rockridge Manor Condominiumd and Plaintiff

12  Sun's fearful of them, he was forced to live in Board and Care for over a year. It was only

13  after Plaintiff Chang sold the Rockridge Manor condo unit and rented an apartment away

14  from the Rockridge Manor Condominium that Plaintiff Sun was finally able to live at home.

16       Ever since these two incidents, Plaintiff Sun's medication has increased from 1 mg of

17  Risperdol  a day to multiple antipsychotic medications (Seroquel, Abilify, Chlorpromazine,

18  Clonazepam, and Benztropine) to over 1500 mg daily. His mental illness is so severe

19  that he mutilates himself from time to time caused by fear of people. He is unable to

20  work relying solely on the Social Security Supplemental Income $1049 monthly (exhibit 2).

21  Although Plaintiff Chang is taking care of Plaintiff Sun but does not support him financially.

22       Plaintiff Sun's injuries are **continuous** and caused directly by these Defendants'

23  intentional torts with conscious disregard Plaintiff Sun's disabilities.

24                          **ISSUES TO BE DECIDED**

25       1. California Probate Code Section 810(c) – A judicial determination that a person is

26  totally without understanding, or is of unsound mind, or suffers from one or more mental

1    deficits so substantial that, under the circumstances, the person should be deemed to lack the

2    legal capacity to perform a specific act, should be based on evidence of a deficit in one or more

3    of the person's mental functions rather than on a diagnosis of a person's mental or physical

4    disorder.

5        2.  California Probate Code Section 811(a) – A determination that a person is of unsound

6    mind or lacks the capacity to make a decision or do a certain act, including, but not limited

7    to, the incapacity to contract, to make a conveyance, to marry, to make medical decisions,

8    to execute trusts, shall be supported by evidence of a deficit in at least one of the following

9    mental functions:

10   (1) Alertness and attention

11   (2) Information processing, including, but not limited to

12       (A) Short and long-term memory.

13       (B) Ability to understand or communicate with others, either verbally or otherwise.

14       (E) Ability to reason using abstract concepts.

15       (F) Ability to plan, organize, and carry out actions in one's own rational self-interest.

16       (G)Ability to reason logically.

17   (3) Thought processes. Deficits in these functions may be demonstrated by the presence of:

18       (A) Severely disorganized thinking.

19       (B) Hallucinations.

20       (C) Delusions.

21       (D) Uncontrollable, repetitive, or intrusive thoughts.

22   (4) Ability to modulate mood and affect.  Deficits in this ability may be demonstrated by the

23       presence of a pervasive and persistent or recurrent state of euphoria, anger, anxiety, fear,

24       panic, depression, hopelessness or despair, helplessness, apathy or indifference, that is

25       inappropriate in degree to the individual's circumstances.

26                                         3

1    Section 811(b) – A deficit in the mental functions listed above may be considered only if the

2    deficit, by itself or in combination with one of more other mental function deficits, significantly

3    impairs the person's ability to understand and appreciate the consequences of his or her actions

4    with regard to the type of act or decision in question.

5    Section 811(c) – In determining whether a person suffers from a deficit in mental function

6    so substantial that the person lacks the capacity to do a certain act, the court may take into

7    consideration the frequency, severity, and duration of periods of impairment.

8    Section 811(d) – The mere diagnosis of a mental or physical disorder shall not be sufficient

9    in and of itself to support a determination that a person is of unsound mind or lacks the

10   capacity to do a certain act.

11   Section 811(e) – This part applies only to the evidence that is presented to, and the findings

12   that are made by, a court determining the capacity of a person to do a certain act or make a

13   decision.

14   3. California Code of Civil Procedure Section 372(a) –

15   When a minor, an incompetent person, or a person for whom a conservator has been appointed

16   is a party, that person shall appear either by a guardian or conservator of the estate or by a

17   guardian ad litem appointed by the court in which the action or proceeding is pending, or by

18   a judge thereof, in each case. A guardian ad litem may be appointed in any case when it is

19   deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof,

20   expedient to appoint a guardian ad litem to represent the minor, incompetent person. The

21   guardian ad litem shall have power, with the approval of the court in which the action or

22   proceeding is pending, to compromise the same, to agree to the order or judgment to be

23   entered therein for or against the ward or conservatee.

24   4. California Code of Civil Procedure Section 373(c) – When a guardian ad litem is appointed,

25   he or she shall be appointed as follows. If an insane or incompetent person is a party to an action

26                                              4

1  or proceeding, upon the application of a relative or friend of such insane or incompetent person,

2  or of any other party to the action or proceeding, or by the court on its own motion.

3      5.  California Probate Code Section 1801(a) – A conservator of the person may be appointed

4  for a person who is unable to provide properly for his or her personal needs for physical health,

5  food, clothing, or shelter, except as provided for the person as described in subdivision (b) or

6  (c) of Section 1828.5.

7      6.  Federal Rule of Civil Procedure 17(c) – District courts have inherent authority and

8  discretion to determine:

9  (a) whether guardian ad litem needs to be appointed to protect interests of incompetent person.

10  (b) whether guardian ad litem will be compensated for his services and, if so, basis upon which

11      value of such services shall be determined.

12  (c) whether compensation payable to guardian ad litem will be treated (1) as court cost  or

13      (2) as expense to be payable out of funds recovered by incompetent person.

14  Under FRCP 17(c) court's power to appoint guardian ad litem is confined to cases where infant

15  or incompetent is "not otherwise represented".

16      7. American with Disabilities Act, 42 U.S.C.S. Section 12131 – with three year statute of

17  limitations in California Civil Procedure Code Section 338(a).

18      8.  California Unruh Civil Rights Act – All persons within the jurisdiction of this state are

19  free and equal, and no matter what their…disability are entitled to the full and equal

20  accommodations, advantages, facilities, privileges, or services in all business establishments

21  of every kind whatsoever…A violation of the right of any individual under the Americans with

22  Disabilities Act of 1990…shall also constitute a violation of this section.

23      9.  California Disabled Persons Act – Cal. Civ. Code Section 51 –

24  (a) Individuals with disabilities shall have the same right as the general public to the full and

25      free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities,

26                                      5

1    including hospitals, clinics, and physicians' offices, public facilities, and public places.

2  (c) A violation of the right of an individual under the American with Disabilities Act,

3    of 1990, 42 U.S.C.S. Section 12131, **also** constitutes a violation of this section.

4    10. Cal. Civ. Code Section 54 - Rehabilitation Act -Although the California Unruh Civil Rights

5  Act does not contain its own statute of limitation, the Ninth Circuit has indicated that the three-year

6  statute of limitations in California Civil Code Section 338 would apply.

7    11. Title 42 USCS 12101 – Congressional purposes of this Act –

8  (1) to provide a clear and comprehensive national mandate for the elimination of discrimination

9    against individuals with disabilities;

10 (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against

11    individuals with disabilities;

12 (3) to ensure that the Federal Government plays a central role in enforcing the standards

13    established in this Act on behalf of individuals with disabilities; and

14 (4) to invoke the sweep of congressional authority, including the power to enforce the

15    fourteenth amendment and to regulate commerce, in order to address the major areas of

16    discrimination faced day-to-day by people with disabilities.

17                          **LEGAL ARGUMENT**

18    1. See EXHIBIT 1 – Deposition of Johannes Ndlela, Ph.D, for California Probate Code

19  Section 810(c) and 811(a)(b)(c)(d)(e) and 1801(a), California Code of Civil Procedure

20  Section 372(a) and 373(c), and Federal Rule of Civil Procedure 17(c).

21    2. Defendants' violations of the American with Disabilities Act, 42 U.S.C.S. 12131,

22  was governed by a three-year statute of limitations. The District Court denied defendants' motion

23  to dismiss. *Janine Kramer v. Regents of the University of California*, 81 F. Supp. 2d 972 (1999).

24    3. California Unruh Civil Rights Act – All persons within the jurisdiction of this state are free

25  and equal, and no matter what their disability are entitled to the full and equal…A violation of the

26                              6

1  right of any individual under the Americans with Disabilities Act of 1990 shall also constitute a

2  violation of California Unruh Civil Rights Act. *Janine Kramer v. Regents of the University of*

3  *California.*

4      4. California Civil Code Section 54 – Rehabilitation Act. The Ninth Circuit has indicated

5  that the three-year statute of limitations in California Civil Code Section 338 would apply.

6  *Olympic Club v. Those Interested Underwriters at Lloyd's London*, 991 F.2d 497, 501 (1993).

7      5. When substantial question exists regarding competence of unrepresented party court may

8  not dismiss with prejudice for failure to comply with order of court; court has discretion to

9  appoint lawyer to represent party, or proceed with competency determination. *Krain v.*

10 *Smallwood*, 880 F2d 1119 (1989).

11     6. It was entirely appropriate that district court, recognizing plaintiff suffered from some

12 degree of mental retardation, appointed guardian ad litem to assist court in determining propriety

13 of his continued participation in litigation. *Fonner v. Fairfax County*, 415 F3d 325 (2005).

14     7. Plaintiff disabled students filed claims under the Americans with Disabilities Act and

15 Rehabilitation Act. The court held: (1) the students were entitled to compensation for counsel's

16 work; (2) the students were entitled to compensation for counsel's work on discovery and

17 depositions because counsel's conduct was reasonable; (3) the students were not entitled to

18 reimbursement for the work done by their fee counsel because the work was duplicative and

19 unnecessary; (4) the students were not entitled to a multiplier because counsel obtained a result

20 that was similar to the result that would have been obtained by other highly compensated

21 attorneys. *Roxanne Lopez and Hugo Lopez, as guardians ad litem v. The San Francisco Unified*

22 *School District*, 385 F. Supp. 2d 981 (2005).

23     8. The authority to award attorneys' fees is derived in part from American with Disability

24 Act Section 505, which provides that in any action commenced pursuant to the Act, the court in

25 its discretion, may allow a reasonable attorney's fee including litigation expenses and costs.

26                                      7

1 | Jordan v. Multnomah County, 815 F.2d 1258 (1987).

2 |     9. Under Federal Rule of Civil Procedure 17(c), a federal court may appoint a guardian ad

3 | litem where a minor or incompetent is not otherwise represented. Rule 17(c) flows from the

4 | general duty of the court to protect the interests of infants and incompetents in cases before the

5 | court. Federal Rule of Civil Procedure 17(b) provides that state law is to determine the

6 | appointment of a guardian ad litem.

7 | ## CONCLUSION

8 |     Plaintiffs Chang and Sun have submitted supporting documents for appointing counsel

9 | for Plaintiff Chang to serve as guardian ad litem to represent Plaintiff Sun's interest. Plaintiffs

10 | respectfully request that this motion be granted to protect Plaintiff Sun who is mentally and

11 | physically disabled.

12 | Dated: February 23, 2008

13 |

14 |                     _____

                      Christine Chang, Plaintiff

**8**

# EXHIBIT 1

1      SUPERIOR COURT IN THE STATE OF CALIFORNIA
2            FOR THE COUNTY OF ALAMEDA
3                  · - - -
4    CHRISTINE CHANG, et al.,        )
                                     )
5                   Plaintiffs,      )
                                     )
6                                    )
                                     )
     vs.                             )        No.  2001-023364
7                                    )
     EVA AMMANN, et al.,             )
8                                    )
                                     )
9                   Defendants.      )
     _____)
10
11                                      CERTIFIED COPY
12
13
14
15               DEPOSITION OF
16            JOHANNES NDLELA, PH.D,
17             OAKLAND, CALIFORNIA
18              MAY 20, 2004
19
20
21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   180 Montgomery Street, Suite 800
     San Francisco, California 94104
23   (415) 421-3021
24   REPORTED BY:  REBECCA L. ROMANO, CSR. NO. 12546
25   FILE NO.:  9E04590

                                             1

```
 1            SUPERIOR COURT IN THE STATE OF CALIFORNIA
 2                   FOR THE COUNTY OF ALAMEDA
 3                         -  -  -
 4    CHRISTINE CHANG, et al.,        )
                                      )
 5                   Plaintiffs,      )
                                      )
 6                                    )
         vs.                          )        No.   2001-023364
 7                                    )
      EVA AMMANN, et al.,             )
 8                                    )
                                      )
 9                   Defendants.      )
      _____)
10
11
12
13
14
15                                     
16    Deposition of JOHANNES NDLELA, PH.D., taken on behalf of
17      Defendants, at 411 30th Street, Suite 314, Oakland,
18            California, commencing at 1:17 P.M.,
19                 Thursday, May 20, 2004, before
20            REBECCA L. ROMANO, CSR. No. 12546
21
22
23
24
25
```

2

```
 1              A P P E A R A N C E S:
 2      FOR PLAINTIFFS:
 3      LAW OFFICES OF PAMELA ZIMBA
        BY:  PAMELA ZIMBA, ATTORNEY AT LAW
 4      Treasury Commons Building
        110 East D Street, Suite A
 5      Benicia, California 94510
        (707) 745-6424
 6
 7      FOR DEFENDANTS-ELIZABETH LADY:
 8      GEARY, SHEA, O'DONNELL & GRATTAN
        BY:  LEO R. BARTOLOTTA, ATTORNEY AT LAW
 9      37 Old Courthouse Square
        Santa Rosa, California 94504
10      (707) 545-1660
11
        FOR DEFENDANTS-EVA AMMANN
12
        CLAPP & MORONEY
13      BY:  CHINH VO, ATTORNEY AT LAW
        6140 Stoneridge Mall Road, Suite 545
14      Pleasanton, California 94588
        (925) 734-0991
15
16      FOR DEFENDANTS-BLAKELY, SINGER, SOLOMON & ROCKRIDGE
                       HOA
17
        ALLMAN & NIELSEN, P.C.
18      BY:  SARA ALLMAN, ATTORNEY AT LAW
        100 Larkspur Landing Circle, Suite 212
19      Larkspur, California 94929
        (415) 461-2700 X204
20
21
22
23
 4
25
```

3

```
                         I N D E X
 1
 2   DEPONENT:  JOHANNES NDLELA, PH.D.
 3   EXAMINATION                                    PAGE
 4       BY:  MR. BARTOLOTTA                         5, 39, 45
 5       BY:  MS. ALLMAN                             24, 42
 6       BY:  MR. VO                                 34
 7
 8   EXHIBITS
 9                          PLAINTIFF
     LETTER                 DESCRIPTION              PAGE
10
11                          (NONE)
12
 3
14
15                          DEFENDANTS
     NUMBER                 DESCRIPTION              PAGE
16
17                          (NONE)
18
19
     QUESTIONS DEPONENT INSTRUCTED NOT TO ANSWER:
20
21                          (NONE)
22
23   INFORMATION TO BE SUPPLIED:
24
25                          (NONE)
                                                          4
```

```
 1                    JOHANNES NDLELA, PH.D.,

 2              having first been duly sworn, was

 3              examined and testified as follows:

 4                           EXAMINATION

 5   BY MR. BARTOLOTTA:

 6       Q    Good afternoon, Doctor.  Could you please

 7   state your name and spell your last name for the court

 8   reporter.

 9       A    It's Johannes Charles Ndlela, N-D-L-E-L-A.

10       Q    Thank you.

11            Have you ever had your deposition taken

12   before?

 3       A    Well, not -- no, I haven't been.

14       Q    Okay.  Let me run over some of the ground

15   rules to help you.

16            First off, for the court reporter's sake, wait

17   until I'm done with my question before you start to

18   answer the question because --

19       A    Yeah.

20       Q    -- she's taking down everything in the room.

21   And if two people are speaking at the same time, it

22   makes it difficult for her to take down the information.

23            If you don't understand one of my questions,

24   and I likely will ask some very bad questions, please

25   let me know that you do not understand the question, and
```

5

1    I will try to rephrase it.  Okay?

2         A    Uh-huh.

3         Q    At a later date, you will receive a copy of
4    this deposition in a transcript form, in a booklet form,
5    and you will have a chance to review that and make
6    changes to it.

7         A    Uh-huh.

8         Q    But you should be forewarned that if you make
9    substantive changes, a "yes" to a "no," or something of
10   that nature, that could be commented upon at a future
11   time, and it could affect your credibility.

12             Do you understand that?

3         A    Uh-huh.

14        Q    You are under penalty of perjury.  I have no
15   doubt that you will tell the truth though.

16             Can you please give me a brief sketch of your
17   educational background, starting with college.

18        A    I did my education in South Africa.  I
19   graduated from medical school at the University of Natal
20   in Durban.  And then I worked at King Edward VIII; I did
21   my internship at King Edward VIII Hospital in Durban.

22        Q    And when was that?

23        A    I graduated from medical school in 1964.  And
24   then '65 I did my internship at King Edward VIII.

25        Q    And where is the King Edward --

6

1      A      It's in Durban.  It's attached to the
2  University of Natal.
3      Q      Okay.  And when did you move to the United
4  States?
5      A      I moved to the United States in 1980.
6      Q      And was that for a job or?
7      A      I came in, yeah, to study.  I studied public
8  health at Loma Linda University in Southern California,
9  in Loma Linda.
10      Q      And when did you move to the Bay Area?
11      A      I moved to the Bay Area in 1995.
12      Q      And how long have you been working at this
13  particular office?
14      A      I'm not sure the -- exactly the date, but --
15      Q      You can give me an estimate.
16      A      I think it was in -- it is 2001, I think.
17  Somewhere in there, I'm not sure.
18      Q      And are you Board certified by the State of
19  California in psychiatry and neurology?
20      A      I'm Board eligible.
21      Q      And how long have you been -- well, let me
22  start.  You are Eric Son's treating psychiatrist at this
23  point in his life?
24      A      I started treating him, according to the
25  records, I think it was on the -- on 6-22-02.

7

1     Q    And who was his treating physician prior to

2    that?

3     A    Dr. Harris, I notice here, was treating him

4    before that.  Yes, in fact, he first saw Dr. Harris

5    according to this.

6     Q    And what is the first date of -- you are

7    looking at the prescriptions?

8     A    Yes.  I am looking at the prescriptions.  But

9    there is an intake here which was done -- let me see.

10   There's an intake here on 3-23 of 2000.

11    Q    Why did you become his treating psychiatrist

12   as of June 2002?

13    A    I think it just happened that the patient was

14   allocated to me at that time.

15    Q    And what is -- psychiatric patients are

16   referenced in three -- or four or five different axes,

17   correct?

18    A    Yes.  There's five.

19    Q    Can you explain what each axis is?

20    A    The Axis I is the psychiatric diagnosis.  Axis

21   II is personality.  Axis III is medical conditions.

22   Axis IV is psychosocial stressors.  And -- and Axis V is

23   the level of function, which is called the JF, and so --

24   Axis V is level of functioning which is recorded as a

25   global assessments scale.  We often refer to it as

8

1    GAS.

2        Q    And what is the scales, of 1 to 100?

3        A    Yes.   It's 1 to 100.

4        Q    Okay.   And 1 being bad, 100 being good?

5        A    Yes.   100 being good.

6        Q    Okay.   When you first started treating Eric,

7    what was his Axis I diagnosis?

8        A    His Axis I diagnosis has remained basically

9    the same.   It's schizophrenia, chronic paranoiac type.

10   I think -- it was his diagnosis, schizophrenia, chronic

11   paranoiac type is -- the code for that is 295.30.

12       Q    And what about Axis II?

13       A    Axis II was deferred.   Axis III was a skin

14   rash in the groin.   And Axis IV was a pressures from the

15   job and home.   And Axis V was fortified.

16       Q    At any time that you were treating Eric, did

17   he indicate that he had social stresses related to

18   problems with neighbors in his apartment?

19       A    Yes.   He always -- most of the time, he always

20   reports that.

21       Q    And what -- what types of things was he

22   reporting?

23       A    Well, usually he said that the neighbors, they

24   are looking at him in a particular way, and he's afraid

25   that they might harm him, and -- or perhaps laughing at

9

1    him or things like that.  He's very suspicious and

2    paranoid.

3        Q    When you say he's paranoid, I assume that's a

4    term of art in terms of providing a diagnosis,

5    correct?

6        A    Well, it's just a description of some of the

7    psychiatric symptoms that he -- he reveals.

8        Q    And as part of his schizophrenia, he does

9    exhibit delusions, correct?

10        A    Yes.

11            MS. ZIMBA:  Objection; vague and ambiguous.

12            THE DEPONENT:  It -- being paranoid is a

13    paranoid delusion, because it -- delusion is a false

14    belief.  So if you are -- if you believe that someone is

15    looking at you or is going to harm you, it's a

16    delusion.

17        Q    (By Mr. Bartolotta)  Okay.  And that is part

18    of something which Eric experienced?

19        A    Yes, he does.

20        Q    Was there ever any -- anything that was told

21    to you by Eric that made you arrive at the opinion that

22    he was not having delusions, but that his neighbors were

23    actually spying on him or doing other things directed at

24    him?

25        A    I cannot prove that.  I don't know.  But

10

1   paranoia is part of his illness.

2       Q    What are the other aspects of his illness?

3   What are the other symptoms of schizophrenia?

4           MS. ZIMBA:   Objection; compound.

5       Q    (By Mr. Bartolotta)   What are the symptoms of

6   schizophrenia aside from delusions?

7       A    Well, schizophrenia is a chronic mental

8   illness which is characterized by the level of

9   deterioration and the level of functioning, which he

10  has -- I supposed he exhibits.  And schizophrenia can

11  present -- you can have positive symptoms like auditory

12  hallucinations, delusions, ideas of reference.

3           And so then you can also have a negative

14  symptoms like anhedonia whereby you're withdrawn and

15  socially withdrawn.  You cannot meet with people.

16      Q    With respect to Eric, has he ever reported

17  auditory hallucinations?

18      A    Not as far as I know.  Since I have had him,

19  he hasn't -- I can't -- he has denied auditory

20  hallucinations.

21      Q    What about visual hallucinations?

22      A    No, he hasn't.  And usually visual

23  hallucinations is not a hallmark of schizophrenia.  It's

24  usually an indication that there is some mechanic brain

5   disease if they have a visual hallucination.  Or people

                                                    11

1    who use drugs usually have visual hallucinations.

2              He hasn't never reported that.

3         Q    Do you know when the onset of his

4    schizophrenia was?  It was late teens or --

5         A    Yes.  According to the notes, yeah, that's

6    what I -- I see that must have started at that time.

7              Usually, it starts at that time when people

8    start going to college.  That's usually the -- the time.

9              I think here it says '94.  I think he must

10   have been around 15, 16, according to the -- to the

11   writing here of Dr. Harris.

12             He was paranoid, thinking that kids were going

13   to kill him, according to this.

14             He was on a summer vacation.  He would check

15   windows and check doors.  That is also part of the

16   illness.

17        Q    Part of the illness is --

18        A    Yeah, I mean --

19        Q    -- constantly checking --

20        A    Constantly checking if there may be -- making

21   sure that the door is closed, that someone might not

22   come in and get you.

23        Q    Okay.

24        A    Because they usually lock -- isolate

25   themselves in one room, in a room when they are really

                                                           12

paranoid and are afraid to get out.

Q    And so through the course of his treatment at this office, had he always -- has he always complained about problems with the neighbors where he's living?

A    Yes.  He has always complained about neighbors.  Most of the time.

Q    And what is your most recent visit?

A    It was on the 15th of May.  And he said to me I think, "I don't want to live there," meaning where they are living right now.  And apparently they are looking at other places.

Q    Did he explain why he didn't want to live where they are now?

A    He -- he always complains about people, that they look at him.  And he was also complaining at one time about the neighbor upstairs, says, "Neighbors have been driving me crazy.  They hit the walls and make noises."  He says that, "There is a weird looking guy was sitting in the parking lot, maybe waiting for me."

         Those are some of the things that he really says.

Q    And what is the date of that note that you just read?

A    It was 4-10-04.  Also I read a little bit from 5-15-04.  And then let's see, on 3-6-04, he says,

13

"Neighbors piss me off, making lots of noises.

2    Everybody is home when they should be out doing

3    something."

4            He feels that everybody, the neighbors, are

5    always staying home when they could be out -- out of

6    there.

7            He says, "I didn't do" -- he says, "I said

8    that everybody is home when they should be out doing

9    something, cars parked in the lot.  I don't do anything

10   to the neighbors."

11           He says he never talks to the neighbors.  He

12   doesn't know them.  And then he says, "I won't be

3    paranoid if I didn't live with these people.  I want a

14   better apartment."

15   Q    Okay.  Is the note that you just read, the two

16   notes that you just read, is that kind of the common

17   reports that you have had with Eric in the past?

18           In other words, are these consistent with

19   the -- or has it changed over time?

20   A    It has been consistent.

21           Yeah, 2-7, it says, "Neighbors start going

22   outside because it is not winter anymore.  Everything

23   disturbs me:  Chainsaws, cars, lawn mowers."  And he

24   mentions all those things.

25           So that was -- that is basically the same

                                                    14

paranoid feelings.

He says here, 1-15, it says, "Paranoid, when people says are fucking with me.  They turn on portable stereo loud."  Complains of many things.  That is basically the theme.

Q    Okay.  Has he ever exhibited symptoms of other types of schizophrenia such as has he ever been catatonic that you are aware of?

A    No, not as far as I was aware.  I see here, "He had an outburst" -- this was on 9-18 -- "had an outburst -- outburst on Monday" --

MS. ZIMBA:  I'm going to object to the extent that that's -- there's no question being posed at this point.

Q    (By Mr. Bartolotta)  Would you please read your note from 9-18-2003.

A    It says, "He had an outburst Monday night, threw an egg, has been suspicious, seeing someone was walking through the window."

Q    In the time that you have been treating Eric Son, has he ever acted out violently towards anyone, that you are aware of?

A    No, not as far as I am aware.  He has been appropriate when it comes to visits.  I mean, there's no violence.  I never known him to be violent.

15

    Q    In terms of medication that Eric is on

2   currently, what is he -- what is his prescription?

3         At the present moment he's taking Depakote,

4   500 milligrams, three tablets at night.  He's taking

5   Benztropine, 1 milligram, one in the morning and one at

6   night.  He's taking Seroquel, 1 milligram -- 400

7   milligrams, one in the morning and one at night.  He's

8   taking Abilify, 30 milligrams at night.  And Klonopin,

9   one to two for anxiety.

10    Q    Okay.  And --

11    A    He has been on several trials of medication.

12    Q    How is he reacting to the current trial of

13   medication?

14    A    He seems stable on this medication, but the

15   paranoid feelings are still there.

16    Q    When is --

17    A    But he's -- he's able to function, which is a

18   goal.

19    Q    What is -- you said Depakote?

20    A    Yes.

21    Q    What is that?

22    A    Depakote is a mood stabilizer.

23    Q    And is that for anxiety?  Is that for

24   depression?  Or is it just kind of --

25    A    It's mainly for anxiety, to moderate his

16

1    moods.

2        Q    And what about these -- Benztropine?

3        A    Benztropine is usually given for -- for side

4    effects.  Usually, most of these medications, the

5    antipsychotics usually produce side effects.  And

6    Benztropine is used for that.

7            The other name is Cogentin.

8            But it is a -- a new one, medication,

9    atypical.  He shouldn't be getting side effects.  But

10   sometimes you can never -- can never know, can never be

11   100 percent.

12       Q    What is --

13       A    So --

14       Q    Seroquel?

15       A    Seroquel is also an antipsychotic.  It has

16   to -- it controls the psychotic symptoms.

17       Q    When you say "psychotic symptoms," how would

18   you define psychotic symptoms?

19       A    Psychotic symptoms are defined as those

20   symptoms which are maybe auditory hallucinations,

21   paranoid ideations.  All those things that are -- are

22   within the range of -- are not within the range of

23   normal.

24       Q    Okay.  I think the next one was Abilify?

25       A    Abilify is one of the newer medications which

                                                      17

1      has also got less side effects.  And he's given -- we

2      give him -- especially at night, it also has a sedative

3      quality to it.

4              Q    And is it an antipsychotic or --

5              A    It is also an antipsychotic.

6              Q    And Klonopin, what is Klonopin?

7              A    Klonopin is Benzodiazepine, which has -- which

8      you can use for anxiety.

9              Q    Is it similar to Valium?

10             A    Yes.  It's in the same class.

11             Q    With respect to the treatment, the time that

12     you have been treating Eric Son, do you have any

13     specific recollection, either just through your memory

14     or through review of your notes, of him mentioning

15     Elizabeth Lady, a neighbor named Elizabeth Lady?

16             A    No, I can't remember.

17             Q    Okay.

18             A    I can't remember.  I would -- maybe I would

19     have written it down.  I can't remember.  Maybe -- I

20     don't know.  I would have to look through all my notes.

21     But offhand, I can't remember.

22             Q    Are there any specific names of individuals

23     who Eric complained about that would be in your notes?

24             A    Well, the only names of individuals -- he

25     mentioned his doctor.  I think, I don't know whether

                                                        18

1    he -- he said he didn't like -- I will have to look at

2    this.

3           I think there was something about a doctor.  I

4    don't know whether he was going visiting and he stopped

5    going there because he said that the hours were -- were

6    quite weird.

7           While he was in reported care, he was

8    supposed -- they were supposed to see that doctor, but

9    he didn't want to go there, because he said that the

10   doctor -- moved into another apartment because seeing a

11   different psychiatrist.  Let's see.

12          I think that's the only thing I remember.  Oh,

13   it says, "Patient doesn't want to see Dr. Sanders.

14   Dr. Sanders doesn't take appointments."  He didn't take

15   appointments.  He just let them -- the patient just come

16   and wait.

17       Q    I see.

18       A    And he would wait until 9:00 p.m. without

19   being seen.  And if he comes in the following day, he

20   would also still have to wait.

21       Q    Since you have been treating Eric Son, has he

22   been hospitalized at all?

23       A    No, he hasn't been.

24       Q    This is kind of an impossible question, I

25   think.  Can you tell what the cause of schizophrenia

                                                          19

is?

2    A    Well, schizophrenia is a psychiatric condition

3    that affects approximately 1 percent of the population.

4    It is -- I can't say the real cause.  It's not known,

5    but it's -- several theories have been postulated.

6          Some have postulated infection during

7    childhood, or some have postulated influenza infection,

8    viral infection, encephalitis.  And it does say --

9    interfere, especially with the dopamine in the brain,

10   those are neurotransmitters.

11         Those are just new theories.  That's why the

12   new medications, they affect the dopaminergic pathways

3    in the brain.

14         But it is really -- no one really knows why it

15   is caused.  And then there were old -- there are old

16   theories, developmental theories about being -- about

17   development, what happens in the environment.

18         So I cannot postulate any --

19   Q    Okay.

20   A    -- any theories.

21   Q    Is there also evidence that suggests some

22   genetic connection?

23   A    Genetic, especially now, that's what they are

24   working on --

25   Q    So it sounds like --

20

A     -- the genetics, but they haven't really

2  identified the gene that is -- is involved.

3       Q    So it sounds like every branch of medicine has

4  their theory.  It's --

5       A    Yes, every -- every branch.

6       Q    Okay.  Based upon your treatment of Eric

7  Son -- well, let me just give you a little bit of

8  background.

9            Part of what this case is about is a situation

10 where social services arrived at Eric Son's apartment

11 with a police officer.

12      A    Uh-huh.

13      Q    And part of the question is -- is how would

14 this -- would this cause damage to Eric Son, would this

15 be a traumatic event for him.

16           And I would like to know if you have an

17 opinion one way or the other as to whether that would or

18 would not.

19      A    Well --

20           MS. ZIMBA:  Objection.  That's an incomplete

21 hypothetical.

22      Q    (By Mr. Bartolotta)  You can provide an answer

23 if you --

24           MS. ZIMBA:  If you can.  It's a completely

25 incomplete hypothetical.  There's absolutely no basis

21

```
 1    for it.  It lacks foundation.  It is incorrect, because
 2    it wasn't social services.
 3         Q    (By Mr. Bartolotta)  Okay.  My question
 4    essentially is:  Will Eric Son react differently than
 5    most people without schizophrenia would act to a
 6    stressful situation?
 7              In other words, a paranoid schizophrenic who
 8    is experiencing a stressful situation, will they react
 9    to it differently than you or I?
10              MS. ZIMBA:  Objection; incomplete
11    hypothetical.
12              THE DEPONENT:  Eric will react in what way?
13         Q    (By Mr. Bartolotta)  Well, will it become a
14    focus of their delusions?  Will it cause them greater
15    anxiety?  Will it cause them to suffer depression?
16              It's kind of a difficult question to --
17         A    It is.
18         Q    But one of the claims in the -- one of the
19    claims in the case is that Eric Son did suffer emotional
20    damages as a result of the incidents that happened.
21              So I'm trying to figure out if somebody is
22    schizophrenic and they are confronted with a trauma,
23    will it have a greater reaction on them than somebody in
24    the normal population.
25              MS. ZIMBA:  Same objection.
```

22

1        Q     (By Mr. Bartolotta)   Is there a way to answer

2    that question?

3        A     Yes, it is.   It is a difficult question.   You

4    cannot really -- you cannot really predict what -- how

5    they are going to be or what -- it is a very difficult

6    question.

7        Q     Okay.

8        A     Yes.

9        Q     Do people with schizophrenia -- I mean --

10       A     Because now it brings in things like PTST,

11   which is really not the issue, what we are talking about

12   here.

_3       Q     Okay.   Do people with schizophrenia have

14   varying levels of it?   In other words, the severity of

15   the schizophrenia, can it vary from person to person?

16       A     Oh, yes, it can vary from person to person.

17   But it is always a downward condition.   It's always -- I

18   mean, if you took -- take out the level, the condition

19   always goes down.   You never really improve.

20       Q     Okay.

21       A     But it can vary according -- I mean, with

22   different people, nurturing can be one of the things

23   that make it better, the factors in the environment, the

24   compliance with the treatment.   Maybe if Eric was not

25   treated or being seen on a regular basis, he could be

23

1    worse than this.

2        Q    Has Eric complied with the treatment that has

3    been prescribed?

4        A    Yes.  In my opinion, he is very compliant.  He

5    keeps his appointments.  He comes almost every month.

6        Q    Okay.  So -- and he's been compliant in

7    showing up?

8        A    And he takes his medication.  And he

9    participates in the decision about his medications.  I

10    discuss them with him each time he comes.

11            MR. BARTOLOTTA:  Okay.  I don't have any

12    further questions right now.  If somebody else wants to

13    ask questions.

14                        EXAMINATION

15    BY MS. ALLMAN:

16        Q    Can you tell me what type behavior a paranoid

17    schizophrenic would exhibit when confronted by a

18    stranger?

19            MS. ZIMBA:  Just in general?

20        Q    (By Ms. Allman)  Yeah.  Just the type symptoms

21    that -- or not symptoms, the behavior they would display

22    if they felt threatened.

23        A    Well, with him, it would be the paranoid

24    feelings.  Perhaps, he might have some anxiety.  But all

25    that is very postulation.  I'm postulating he could have

                                                            24

1    some anxiety.

2         Q    Well, I'm trying --

3         A    He could lock himself in the house or not get

4    out.  Those are some of the things that have been --

5    have been seen.

6         Q    And are there any typical things that paranoid

7    schizophrenics say if they feel threatened?

8         A    Nothing, I mean, apart from what Eric has said

9    here.

10        Q    Do paranoid schizophrenics act particularly

11   defensive when they feel threatened?

12        A    Well, they would always have.  I mean, it's a

3    natural reaction to any threat, that you feel threatened

14   when you are -- when someone just approaches you.  I

15   think they would be -- they would feel threatened.

16        Q    And what type things do paranoid

17   schizophrenics do to defend themselves?

18        A    It is mainly withdrawn.  They become paranoid

19   and withdrawn.  They don't want to interact, to get out.

20   They don't get out and be aggressive.  They -- they

21   socially withdraw from the thing that might stimulate

22   them.

23        Q    Is it consistent with a paranoid

24   schizophrenic's behavior to, when threatened, threaten

25   back?  Is that consistent?

25

1      A      To threaten back?

2      Q      Right.

3      A      You mean, to fight?

4      Q      Or not to fight, but just to say, hey, you
5    know, come any closer and I'm going to --

6      A      Some of the behaviors or with some of the
7    patients, perhaps they might feel the need to protect
8    themselves.  Like a patient can feel the need of
9    carrying a knife, being afraid that he might be
10    attacked, just as a matter of protection, or sleep with
11    a knife or something, with a weapon.  Sometimes they do
12    that, which is possible.

3      Q      Sleep with a weapon, did you say?

14      A      Yes.  Some -- I have seen some other patients
15    who come in with a story that whenever they sleep, they
16    sleep with a weapon because they are afraid that someone
17    might come in and attack them.

18           So those are some of the ways might react that
19    way.

20      Q      Would it also be consistent for someone to
21    state that they had a weapon in order to protect
22    themselves?

23      A      To state?

24      Q      In response to some fear or anxiety, state --
_5    state that they have a weapon.

26

1          A     Some -- some say that they -- there are some
2     who might say, who might carry a weapon, that I feel I
3     should kill myself before they kill me.  Some usually
4     say that.

5          Q     What about actually threatening others that
6     they have a gun or a weapon?

7          A     It is possible.  They can -- they can -- they
8     can do that if they really feel they are threatened.

9                There are -- I have seen some of the patients
10    who are brought in on a 5150, sometimes carrying a
11    weapon or carrying a knife with the purpose of
12    protecting themselves.  That's what they said.

13         Q     And would it be consistent with a paranoid
14    schizophrenic for them to indicate that they had a
15    weapon even if they, in fact, did not, in order to
16    protect themselves, or to give that appearance that they
17    had a weapon when they, in fact, did not?

18         A     They always say -- they usually say they
19    would -- I mean, most -- the most -- most of the
20    patients I have seen, they usually say if they have a
21    weapon.

22               I had one just today who was brought in by the
23    police and went to the doctor, and he had a knife, and
24    he handed the knife to the doctor.

25         Q     I guess what I'm trying to get at,

27

1    specifically, is it -- would it be consistent with a

2    paranoid schizophrenic's behavior for him or her to say,

3    to -- to indicate that they had a weapon when, in fact,

4    they did not, so that they could give the appearance

5    that they --

6         A    No.

7         Q    -- were protected?

8         A    That, I don't know.  I really don't know.

9         Q    Okay.  Would it surprise you, based on what

10   you know about Eric Son, that if he were to have

11   indicated that he had a gun when approached by -- or

12   when confronted by someone?

13              MS. ZIMBA:  Objection; incomplete

14   hypothetical.

15        Q    (By Ms. Allman)  Would it --

16        A    Would it be --

17        Q    Would that surprise you, knowing what you know

18   about Eric Son, if he were to have threatened to have

19   had a gun?

20              MS. ZIMBA:  Same objection.

21              THE DEPONENT:  I -- I really don't understand

22   the question because, as I said, that he hasn't been

23   violent, and he has no history of violence.  I wouldn't

24   really imagine him having a gun.  I really don't know.

25   I cannot answer that.

28

Q    (By Ms. Allman)   Okay.   Let's assume he didn't
have a gun.

A    Yes.

Q    Would it surprise you if he told someone he
did have a gun when, in fact, he did not?

MS. ZIMBA:   Same objection; incomplete
hypothetical.

THE DEPONENT:   I don't know if I -- I can't
answer that.

Q    (By Ms. Allman)   What extremes have you seen
patients with paranoid schizophrenia go to in order to
defend themselves against what they perceive as a
threat?

A    As I said before, that if they are in this
room, they would lock the room, make sure that the room
is locked, barricade them -- themselves.   And they might
do a quite a number of things, check the windows whether
they are closed.   But those are the ways of making sure
that their environment is safe.

And then when they are outside, then they will
be always doing that -- that checking or, I mean,
looking at people and checking whether people might not
be following them or about to hurt them.

But the other thing we should bear in mind is
that it's not only about protection, about being afraid

29

1    of people.  People who are paranoid, they are sometimes
2    afraid to eat, thinking that their food might be
3    poisoned.  And then they can lose a lot of weight
4    because of that.

5          They can even refuse the medication that we
6    give them believing that we are offering them poison.
7    They can believe they are being watched by cameras.  And
8    they have a long story.

9          So it's a complicated thing.  We -- it looks
10   like -- we cannot only concentrate on the things that --
11   we cannot only concentrate on the fact that it's only
12   people that they are afraid of.  The whole environment
13   and everything.

14   Q    And as a treating doctor, there's no way you
15   can determine whether what they are reporting is based
16   on fact or a delusion?

17   A    Yes, you have to prove whatever delusion.  You
18   have to find out whether that is consistent with what is
19   actually happening.

20   Q    And have you made any assessments in Eric
21   Son's case as to whether there is any validity to
22   anything that he reported?

23         MS. ZIMBA:  Objection; vague and ambiguous;
24   compound; lacks foundation.

_5         THE DEPONENT:  To check whether what he says

30

```
       is -- is valid or not?
  2         Q    (By Ms. Allman)   Is accurate.
  3         A    I don't think that is my job to go and assess
  4    that, because it means I must go out to where Eric lives
  5    and really --
  6         Q    So if --
  7         A    -- that's a --
  8         Q    I'm sorry.
  9         A    And it means that I must go over to Eric's
 10    place and assess the validity of that.
 11         Q    That's not your role?
 12         A    No, I don't think that I have to go out
  3    there.
 14         Q    So if Eric Son were to complain, for example,
 15    that his mother were stalking him, you wouldn't make any
 16    kind of independent investigation into that?
 17         A    I can talk to the mother if Eric agrees.
 18    There are also issues of confidentiality, and I have to
 19    abide by those.   Before I can talk to anyone or do
 20    anything, I need to get permission from Eric to do
 21    that.
 22         Q    Did Eric Son ever have any verbal outbursts in
 23    your presence?
 24              MS. ZIMBA:   Objection; vague and ambiguous.
  5              THE DEPONENT:   I can't remember.
```

                                                            31

1      Q    (By Ms. Allman)   Why is it that -- if you
2   know, why does schizophrenia begin when people go to
3   college or at that stage?

4      A    Well, there are many theories as far as that
5   is concerned.  All of them have got to do with the
6   change of environment, the nurturing, they have been in
7   a nurturing environment and then they go out, they are
8   on their own.  And they have lots of stressors that are
9   facing them.  That's when -- then probably begins at
10   that time.

11      Q    So would you anticipate that Eric Son, if he
12   were left on his own, if his mother went away for
13   approximately one week, that he would find that to be
14   more stressful?

15      A    For one week?  Well, I mean by being -- by
16   changes, you see, I think changes that are on ongoing
17   basis.  Just for the mother leaving for one week and
18   coming back, it won't necessarily make him
19   schizophrenic.

20      Q    You --

21      A    Therefore --

22      Q    You don't feel that that would in any way
23   aggravate his symptoms?

24      A    Well, if he's already has schizophrenia or if
5   he -- he's just a normal person, normal coping person?

32

1        Q      No.  I'm talking about Eric Son.

2        A      If he's left alone?

3        Q      He's living with his mother on an ongoing

4    basis --

5        A      Uh-huh.

6        Q      -- on a day-to-day basis, and she leaves for

7    approximately one week, and leaves him alone in the

8    apartment.

9        A      It might affect him.

10        Q      How so?

11        A      He might be paranoid and be scared and be

12    anxious for that -- for that time.

13        Q      Because of the jeopardy to the nurturing

14    environment?

15        A      Because he's left alone.  I mean, he's

16    unsettled about what -- about the conditions that are

17    going on at the moment.  Especially if you are paranoid,

18    you really don't know what might be happening within

19    your environment, if you are left alone.

20               MS. ZIMBA:  I'll pass the questioning.

21               MR. VO:  I just have a few follow-up

22    questions.

23               THE DEPONENT:  Yes.

24

25                        EXAMINATION

33

BY MR. VO:

   Q   During your course of treatment with Eric Son

from June 2002 to the present, has he referenced any

neighbors by name who caused him stress or --

   A   By name?

   Q   Yeah.

   A   No, he hasn't said that.  I have no names.

   Q   Okay.  And -- and during the course of your

treatment with Eric Son, have you had conversations with

anybody else other than Eric Son?

   A   Sometimes --

      MS. ZIMBA:  Objection; vague and ambiguous.

In reference --

   Q   (By Mr. Vo)  Go ahead.

   A   It's only the mother who accompanies him.

   Q   Okay.  And have you spoken with -- with

Ms. Chang about Eric's condition or what causes it?

   A   Yes.  Because whenever she expresses concern,

perhaps around medication, also around psychiatric

symptoms that perhaps might still be going on.

   Q   Okay.  And what has Ms. Chang told you

regarding her belief about what the causes are of his

paranoia schizophrenia?

      MS. ZIMBA:  Objection.  I think that extends

beyond the scope of this deposition.

34

```
 1              THE DEPONENT:  No, she's not in a position --
 2              MR. VO:  Pardon me.
 3              MS. ZIMBA:  I think that invades her right to
 4    privacy.  It extends beyond the scope of the deposition
 5    and the parameters that the Court set forth to discuss
 6    what it is that Ms. Chang may have discussed with
 7    Dr. Ndlela.
 8         Q    (By Mr. Vo)  Are you aware -- has Ms. Chang
 9    ever told you about a lawsuit?
10              MS. ZIMBA:  Same objection.
11         Q    (By Mr. Vo)  Dr. Ndlela?
12         A    I'm aware that there is a lawsuit, but I
 3    really don't know what it entails.
14         Q    Can you tell me what, if anything, you know
15    about the lawsuit?
16         A    I really never asked, probed to find out what
17    it was all about.
18         Q    Do you know what event -- strike that.
19              Are you aware of any stress event in the year
20    2000 that may have worsened or caused Eric Son to become
21    a paranoid schizophrenic?
22         A    Year 2000 --
23         Q    Yeah.
24         A    -- 2002.  2002?
 5         Q    The year 2000.  In the year 2000.
```

35

1      A     No.

2      Q     What about the year 2000 --

3      A     I hadn't even had Eric.  I don't know.  Maybe

4    I can look at Dr. Harris' notes about 2000.

5      Q     Have you reviewed Eric Son's treating records

6    from Dr. Harris before you took on the charge of Eric?

7      A     Yes, I did.

8      Q     Okay.  And in your review of those notes, are

9    you aware of any stressed events in the year 2000 that

10   may have caused Eric Son to become either a paranoiac

11   schizophrenic or made the condition worse?

12     A     Well, I don't think that it would be an event

13   that would make him worse because he already has, you

14   see, the condition, the disease.

15     Q     Okay.  And I'm not sure if I understood you

16   earlier.  I think what you were saying was the condition

17   deteriorates.  That means, doesn't it --

18     A     Yeah.  Yes, it does.  It does.

19     Q     -- that it does get better or it does not get

20   better?

21     A     It doesn't get better.

22     Q     Okay.

23     A     It deteriorates.

24     Q     So --

25     A     It's a downward mobility.

36

1       Q    Let me see if this is correct.

2       A    Yes.

3       Q    If it goes untreated, it gets a lot worse, but

4   it goes untreated, it doesn't necessarily get better?

5       A    It doesn't necessarily get better.

6       Q    Okay.

7            MR. BARTOLOTTA:  Does it ever get better?

8            THE DEPONENT:  It doesn't.  It doesn't get

9   better.  It rarely -- they always draw it as a downward

10  condition.  It's a -- what determines is the amount of

11  nurturing, the treatment.  That would depend on whether

12  it goes like this or like this.

13      Q    (By Mr. Vo)  Do you have an opinion whether or

14  not any events or activities of a neighbor caused Eric

15  Son to be -- Son's condition to worsen?

16      A    No.  Opinion of knowing --

17      Q    Yeah.  Any medical opinion about any of the

18  neighbor's activities that may have caused Eric Son's

19  condition to worsen.

20           MS. ZIMBA:  Well, I am going to object to that

21  to the extent that --

22      Q    (By Mr. Vo)  Do you have any opinion at all?

23           MS. ZIMBA:  -- he's really already said that

24  he doesn't, that he's not aware of the lawsuit.  He

25  hasn't --

37

1                    THE DEPONENT:  I'm not --

2              MS. ZIMBA:  -- probed into that.

3              THE DEPONENT:  I'm really not aware.  I don't

4     know what the neighbors did.  I cannot really relate

5     about that because I really never probed to find out

6     what the neighbors did and who those neighbors were.

7         Q    (By Mr. Vo)  Okay.  Well, in your -- during

8     the time that you treated Eric Son, he was also

9     complaining about neighbors, correct?

10        A    You mean the patient?

11        Q    Yeah.

12        A    Yes.  He has always complained.  It's part of

13    his -- I think it's part of his paranoid feelings of

14    this illness.

15        Q    When you say that you think it's part of his

16    paranoid delusions, have you had discussions with Eric

17    about the difference between perceived threats versus

18    real threats?

19              Do you know what I mean?

20              When you say delusion, it's a perceived threat

21    that's unreal, correct?

22        A    Yes.

23        Q    Okay.  Now, have you -- have you -- do you

24    know if Eric knows the difference between a perceived

25    threat or a delusion versus something that's real?

                                                          38

A        As someone who has schizophrenia, he would not
be able to distinguish.  That's why they are sick.  They
cannot distinguish between reality, something that's
going on.  They have -- they need -- even if you do a
reality testing, they cannot.  And you cannot tell them
that this is not -- this is a delusion.

Q       Okay.

A       Because it won't help them.  It won't help you
or help anyone if you tell them --

Q       Okay.

A       -- that you are having a delusion.

Q       I'm being real ignorant here.

        Is part of the treatment to help the patient
understand the difference between perceived versus real
threats?  Or you are saying it doesn't help, you are not
able to do that?

A       You can try, but the patient will not
really -- because to him, the patient will tell it's
real to him, it's really happening.

        MR. VO:  Okay.  Thank you.  I have nothing
further.

                    FURTHER EXAMINATION

BY MR. BARTOLOTTA:

Q       I just -- in looking through the progress
notes, and I believe these were with Dr. Harris.

                                                    39

1              First of all, is Dr. Harris still with this

2    facility?

3         A    Yes, he is.  He's a director of this

4    facility.

5         Q    Okay.  In looking through some of his notes,

6    and I think yours are probably in chronological order,

7    I'm looking at the mental status and assessment progress

8    notes.

9         A    Where is that?

10        Q    It looks like August 2000.  You know what I'm

11   going to do?  I'm simply going to hand it to you.

12        A    Let's see.  Let's see.  May 2002.

13        Q    It's hard because it doesn't have a date on

14   it.  Oh, no, it does.  Tell you what, if you look at the

15   bottom here, the date says 7-20-2001, assuming that's

16   actually -- you know, they all say that.  It doesn't

17   help.

18             MR. VO:  Why don't you show it to him.

19        Q    (By Mr. Bartolotta)  I'm just looking at this

20   where it says, "Delusion," and it says, "Yes."  And then

21   "Paranoid, people in building."

22        A    Uh-huh.

23        Q    I can't quite read that.  And then --

24             MR. VO:  Wearing his Walkman.

25        Q    (By Mr. Bartolotta)  So I think he's putting

                                                        40

his Walkman on.

2       A    Yeah.  Sometimes they do.

3       Q    And then here's another note.  Again, it

4    says --

5       A    "Paranoid."

6       Q    -- "He does have delusions.  Paranoid people

7    in building out to get him."

8       A    It says here he has delusions.

9       Q    Okay.

10      A    They checked "Yes."

11      Q    And so that is -- I mean consistently been

12   characterized as a delusion as opposed to a complaint --

3            MS. ZIMBA:  Objection.

14      Q    (By Mr. Bartolotta)  -- of a --

15           MS. ZIMBA:  Vague and ambiguous.

16      Q    (By Mr. Bartolotta)  Well, and through your

17   treatment, Eric has told you that he's concerned about

18   the way people in his building or his neighbors are

19   treating him, correct?

20      A    Uh-huh.

21      Q    They are either spying on him or --

22      A    Uh-huh.

23      Q    -- out to get him?

24      A    Uh-huh.

5       Q    And you have characterized that or you would

                                              41

characterize that as a delusion; is that correct?

2     A    Yes.

3         MR. BARTOLOTTA:  I don't have anything

4  future.

5               FURTHER EXAMINATION

6  BY MS. ALLMAN:

7     Q    Do caregivers or parents, do they have a

8  tendency to try and believe what it is their child, who

9  is affected by paranoid schizophrenia, is saying when in

10  fact it's a delusion?

11     A    When the parents --

12         MS. ZIMBA:  Objection; vague and ambiguous,

3  and incomplete.

14     Q    (By Ms. Allman)  Do parents have a tendency to

15  try and believe it or to believe what it is the paranoid

16  psychotic person --

17     A    Well, the parents --

18     Q    -- is saying?

19     A    -- are more concerned about having a sick -- a

20  sick child, that their -- that their main thing is --

21  especially if you have a child with mental illness.

22     Q    Do they tend to believe what it is they are

23  complaining of, the things that they are reporting, like

24  people are stalking me and out to get me?  Or -- in your

5  experience, have parents been able to --

1      A    I cannot --

2      Q    -- disassociate --

3      A    I cannot answer that.

4      Q    Okay.  You don't treat the family as the

5  whole?

6      A    We do treat the families as a whole -- as a

7  whole.

8      Q    What have you noticed in the case of --

9      A    But it would really be generalizing really.

10  That's why I cannot answer.

11      Q    Well, in the case of Mrs. Chang, have you

12  noticed any tendency on her part to believe in the

13  delusions of Eric Son?

14           MS. ZIMBA:  Objection; invades Ms. Chang's

15  right to privacy; completely -- the question completely

16  extends beyond the scope of what the Court set forth as

17  to what Dr. Ndlela could testify in the deposition

18  today.

19           MR. BARTOLOTTA:  He can still answer.

20           MS. ZIMBA:  No, he cannot answer that

21  question.  That is an invasion of Ms. Chang's right to

22  privacy.  And he would be betraying a confidence if he

23  were to answer that question.

24           MR. BARTOLOTTA:  Well, I think -- I disagree

25  with you.

43

1          MS. ZIMBA:  Well, then he can make the

2    decision whether he's going to answer the question or

3    not --

4          MR. BARTOLOTTA:  Okay.

5          MS. ZIMBA:  -- but he can also run the risk

6    that if he answers the question, he's invading

7    Ms. Chang's right to privacy.

8          That was not a part of the scope of this

9    deposition.

10          MR. BARTOLOTTA:  Doctor, are you Ms. Chang's

11   treating physician?

12          THE DEPONENT:  Ms. Chang's?

13          MR. BARTOLOTTA:  Yeah.

14          THE DEPONENT:  No.

15          MR. BARTOLOTTA:  Have you ever provided her

16   treatment whatsoever?

17          THE DEPONENT:  No.

18          MR. BARTOLOTTA:  Okay.  I will just make the

19   record.

20     Q    (By Ms. Allman)  The question that I asked was

21   in the case of Mrs. Chang.  In your dealings with her

22   when you have treated Eric Son, did she exhibit any

23   tendency to believe the -- what the delusion that Eric

24   Son was reporting?

25          MS. ZIMBA:  Same objection.

                                                      44

1          I think that Mr. Ndlela --

2          THE DEPONENT:  I think that it is

3    speculation.

4          MS. ZIMBA:  -- Dr. Ndlela is running a risk.

5          THE DEPONENT:  I think it is best that we just

6    concentrate on Eric Son, the person that I'm treating.

7      Q    (By Ms. Allman)  You don't have any opinion

8    about Mrs. Chang?

9          MS. ZIMBA:  Same objection.

10          THE DEPONENT:  I would not like to say

11   anything.

12          MS. ALLMAN:  Nothing further.

13          MR. BARTOLOTTA:  Do you have any?

14          MR. VO:  No.

15          MR. BARTOLOTTA:  I have one.

16                 FURTHER EXAMINATION

17   BY MR. BARTOLOTTA:

18      Q    In terms of this lawsuit, would you, at this

19   point, be able to provide an opinion one way or the

20   other whether any conduct of specific defendants caused

21   Eric Son to have mental pain and suffering?

22          MS. ZIMBA:  Well, objection.  Dr. Ndlela has

23   already said that he's really not probed into the

24   lawsuit.

25          THE DEPONENT:  I'm not --

45

1     Q     (By Mr. Bartolotta)   If your answer is no, I'm
2  not going to complain.

3     A     Uh-huh.

4     Q     And I'm just asking you.  Would you be
5  prepared to give an opinion today one way or the other
6  whether any defendant that you know of in this lawsuit
7  did or did not cause Eric pain and suffering?

8     A     It's difficult for me to express an opinion
9  because I really don't know the facts.

10    Q     I understand.

11    A     I think the best thing would be to get a
12 forensic psychiatrist who -- if you really want those
3  answers.

14    Q     And I guess the reason I -- the way I phrased
15 the question was is as you sit here today with the
16 information you know, would you be able to express such
17 an opinion?

18          And I only ask this question because I don't
19 want to get to trial and suddenly have you come on the
20 stand and provide an opinion that I wasn't aware of.

21          So I understand you have a limited
22 understanding of how the lawsuit is, you know, what the
23 facts are and who's involved.

24    A     Uh-huh.

5     Q     So as you sit here today, could you give an

46

1    opinion one way or the other as to whether the -- you

2    know, Eric Son suffered an emotional injury as a result

3    of defendants' conduct in this lawsuit?

4        A    I don't think that I can give that --

5        Q    Okay.

6        A    -- because I don't know the facts.

7            MR. BARTOLOTTA:  I understand.  Thank you very

8    much.  I don't have any further questions.

9            MR. VO:  Thank you, Dr. Ndlela.

10           THE REPORTER:  Ms. Zimba, would you like a

11   copy?

12           MS. ZIMBA:  Yes.

13           THE REPORTER:  Ms. Allman, would you like a

14   copy?

15           MS. ALLMAN:  Yes.

16           THE REPORTER:  Mr. Vo, would you like a copy?

17           MR. VO:  Yes.

18           THE REPORTER:  Mr. Bartolotta?

19           MR. BARTOLOTTA:  Yes.

20           THE REPORTER:  Thank you.

21           MR. BARTOLOTTA:  Off the record.

22           (Deposition concluded at 2:18 P.M.

23

24                   ---o0o---

25   STATE OF CALIFORNIA        )

                               )

                                                      47

COUNTY OF SAN FRANCISCO   )

    I, the undersigned, declare under penalty of
perjury that I have read the foregoing transcript, and I
have made any corrections, additions or deletions that I
was desirous of making; that the foregoing is a true and
correct transcript of my testimony contained therein.

            EXECUTED this _____ day of _____,
20_____, at _____, California.
                        City








_____

            JOHANNES NDLELA, PH.D.




            REPORTER'S CERTIFICATE

48

1                    REPORTER'S CERTIFICATE

2

3

4          I, REBECCA L. ROMANO, CSR. No. 12546, Certified

5     Shorthand Reporter, certify;

6          That the foregoing proceedings were taken before me

7     at the time and place therein set forth, at which time

8     the witness was put under oath by me;

9          That the testimony of the witness, the questions

10    propounded, and all objections and statements made at

11    the time of the examination were recorded

12    stenographically by me and were thereafter transcribed;

13         That the foregoing is a true and correct transcript

14    of my shorthand notes so taken.

15         I further certify that I am not a relative or

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18         I declare under penalty of perjury under the laws

19    of California that the foregoing is true and correct.

20         Date this 4th day of June, 2004.

21

22

23    _____
      REBECCA L. ROMANO, CSR No. 12546

24

25

49

## CERTIFICATE OF SERVICE

I, CHRISTINE CHANG, hereby certify that on February 29, 2008, I forwarded a true and correct copy of:

1. Declaration of Plaintiff Christine Chang in support of appointing counsel
2. Declaration of Hiawatha Harris, M.D. for appointment of counsel
3. Memorandum of points and authorities in support of appointment of counsel

To Defendants' Counsels by placing a true copy and exhibits thereof in a sealed Envelope with first class postage prepaid and addressed as follows:

Gaylynn Kirn Conant
Lombardi, Loper & Conant, LLP
Lake Merritt Plaza
1999 Harrison Street, Suite 2600
Oakland, CA 94612-3541

Paul A. Conroy
Allman & Nielsen
100 Larkspur Landing Circle
Suite 212
Larkspur, CA 94939

Lee J. Danforth
Coddington, Hicks & Danforth
555 Twin Dolphin Drive, Suite 300
Redwood Shores, Redwood City,
California 94065-2133

Andrew Adler
Boornazian, Jensen Garthe
555 12th Street, Suite 1800
Oakland, CA 94607

Albert F. Coombes
15915 Ventura Blvd., Penthouse 4
Encino, CA 91436

Edward Rodzewich
Valvrian, Patterson and Stratman
1650 Harbor Parkway, Suite 100
Alameda, CA 94502

I caused such envelopes to be placed for collection and mailing in the United States Mail at San Francisco, California.

Dated:  February 29, 2008

By _Christine Chang_

Christine Chang, Plaintiff