Christine Chang Pro Se, Individually
And Eric Sun, disabled
341 Tideway Drive #214
Alameda, CA 94501
Telephone: (510) 769-8232

FILED
08 MAR 24 PM 3:44
RICHARD W. WIEKING
CLERKS DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE CHANG, individually And ERIC SUN, disabled<br><br>Plaintiffs,<br><br>vs.<br><br>ROCKRIDGE MANOR CONDOMINIUM et al.<br><br>Defendants. | Case No: C-07-4005 EMC<br><br>PLAINTIFFS MOTION FOR JUDGE CHEN'S RECUSAL BASED ON PERSONAL BIAS AND PREJUDICE AND IN FAVOR OF ADVERSE PARTY. 28 U.S.C.S. Section 144.<br><br>Date:<br>Courtroom:<br>Judge: |

**FACTUAL BACKGROUND**

1. Plaintiffs Chang and Sun, single mother and son, were severely discriminated and persecuted by the Rockridge Manor Manager, President, Board of Directors, and several homeowners, starting 1997 until September 2003, when Plaintiffs were forced to sell their home of thirteen years and move away.

1

1   2. Plaintiffs Chang and Sun's <u>state actions</u> starting 2001 until 2005 were sabotaged
2   by the Rockridge Manor Condominium Defendants assisting by the Defense Attorneys
3   from the very beginning until ending in April 2005.
4   3. Plaintiffs' original complaint in this instant action No. C-07-4005, paragraph 66
5   through 110, clearly stated how Plaintiffs' five attorneys defrauded against Plaintiffs
6   on behalf of the Rockridge Manor Condominium Defendants in the <u>state action</u>.
7   4. In the original complaint of this action, paragraph 67 through 70, Plaintiffs
8   clearly stated how Plaintiffs' attorney, Brett Allen, secretly filed the first amended
9   complaint in the <u>state action</u>, against the Rockridge Manor Homeowners Association,
10  to absolve the Rockridge Manor Manager, President, and Board of Directors' personal
11  liabilities owed to Plaintiffs.
12  5. In the original complaint of this action, paragraph 68 through 70, Plaintiffs
13  clearly stated how Plaintiffs' attorney, Brett Allen, defrauded against Plaintiffs who
14  were unaware of Brett Allen filing first amended complaint against Rockridge
15  Manor Homeowners Association within weeks after he filed the original <u>state action</u>.
16  6. In the original complaint of this action, paragraph 70, Plaintiffs stated clearly
17  how Rockridge Manor Individual Defendants turned Plaintiffs' <u>state action</u> against
18  Plaintiffs, which subsequently causing aggravated assault/battery against Plaintiffs,
19  on the same date of Board of Directors announced the Rockridge Manor
20  Homeowners Association was **being sued by Plaintiffs**.
21  7. In this instant action, Plaintiffs' Opposition to Defendants Rockridge Manor
22  Homeowners Associations Motion to Dismiss and for Summary Judgment, filed on
23  December 26, 2007, page 4, paragraph 2, Plaintiffs clearly stated and provided evidence
24  including the <u>state action</u> initial complaint and first amended complaint and relevant
25  communication with Plaintiffs' attorney, Brett Allen.  The evidence attached to the
26  Opposition (exhibits 3.2, 3.3, 3.4, 3.5, 3.6, 3.8, 3.92, 3.93 and 3.94) clearly established
27  that Plaintiffs were unaware of the existence of <u>state action</u> first amended complaint.
28  
                                                2

## JUDGE CHEN'S ORDER

8. In the Order Granting Defendants' Motions to Dismiss...and Summary Judgment (filed on February 13, 2008, page 9), it stated that Plaintiffs contended being fraudulently induced into signing the release by Plaintiffs' attorneys. Even if as a **theoretical matter**, fraud in the inducement could vitiate a release, the Court finds this argument unavailing.

9. In page 13, it stated that the complaint fails to identify facts such as the times, dates, and places of the alleged fraud. In fact, the Court does not discern where in the complaint Plaintiffs have alleged any false representation, concealment, or nondisclosure by the Homeowners Association. The elements of fraud are: (1) a misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; (5) resulting damage......(A defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable). **No specific fraudulent misrepresentation is alleged**.

10. In page 14, it stated that such a far reaching **fantasticconspiracy**....but in any event Plaintiffs fail to allege any specific facts....Plaintiffs' assertion that all of their attorneys were involved in the conspiracy, in particular, the two Attorney Defendants sued herein, Ms. Zimba and Mr. Coombes. Plaintiffs contend that, as part of the conspiracy, the two Attorney Defendants conspired with the Homeowners Association and others to turn the suit against Ms. Celaya against her and pressured Plaintiffs into accepting a low settlement from the Homeowners Association to resolve the second state court lawsuit. However, that her own attorneys would have so conspired makes no logical sense since this would have been against the attorneys' own economic interest. According to Plaintiffs, the attorneys forced Plaintiffs to enter a new retainer agreement that would give them 33 1/3% of any damage award. It makes no sense why the attorneys would undermine cases in which they had an economic interest. Opp'n at 9.

11. In page 15, it stated "As a final point, it is worth noting that, at the hearing, Plaintiffs claimed that, based on their inability to attract counsel for this case, the massive conspiracy against them had spread even further to include a bar association referral service. Once again, this demonstrates that Plaintiffs' claim of conspiracy is **ultimately nothing more than speculation**. Indeed, not only does the conspiracy allegation fall far short of *Bell Atlantic*, it is **patently fanciful and insubstantial**. (28 U.S.C. Section 1915 gives a court "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless" – e.g., **"fantastic or delusional scenarios"** in cases filed in **forma pauperis**).

12. In page 19, it stated....since the conspiracy allegations are **so implausible fantastic**.

13. In page 22, it stated....As for the alleged conspiracy between the University employees and the other Defendants, the contention is **sheer speculation lacking plausibility**.

14. In page 23, it stated "The conspiracy claim is **fantastic, speculative and implausible** and not subject to repair by amendment.

### ISSUES TO BE DECIDED

15. Whether Plaintiffs are entitled to have another judge to hear the case.

16. Whether Plaintiffs are entitled to have another judge to decide the merit of Plaintiffs' reconsideration of Court Order granting Defendants Rockridge Manor Condominium's motion to dismiss and summary judgment (filed February 29, 2008).

17. Plaintiffs find the Court Order being bias, prejudice, and in favor of adverse party. Plaintiffs believe that the bias is personal as opposed to judicial in nature.

18. The Order stated Plaintiffs as **"fantastic conspiracy, ultimately nothing more than speculation, patently fanciful and insubstantial, fantastic or delusional scenarios, forma pauperis, so implausible fantastic, sheer speculation lacking**

4

1 | **plausibility, fantastic, speculative and implausible**.

2 | 19. Whether Plaintiffs are entitled to have another judge to decide the merit of Plaintiffs' complaint and all filings, Plaintiffs' truthfulness in filing the complaint and all court documents, and Plaintiff Chang's truthfulness in the hearing argument.

## PLAINTIFFS' ARGUMENT AND EVIDENCE

20. The Order stated that "Even if as a **theoretical matter**, fraud in the inducement could vitiate a release, the Court finds this **argument unavailing**. In Plaintiffs' original complaint (filed August 3, 2007, paragraph 67 thru 77) and Opposition to Defendants Rockridge Manor homeowners associations motion to dismiss and for summary judgment (filed December 26, 2007, page 4, paragraph 2), had clearly demonstrated with evidence that the Defendants Rockridge Manor Condominium corrupted Plaintiffs' attorney, Brett Allen, who fraudulently file the state action first amended complaint suing the homeowners association, while Plaintiffs intended to sue the Individual Defendants Rockridge Manor Manager, President, and Board of Directors. After the state action first amended complaint was filed, the Rockridge Manor Condominium individual defendants immediately hired defense attorneys paying by homeowners association funds, and aroused homeowners hatred against Plaintiffs who were aggravately assaulted and battered by The Regents of University of California Defendant Constance Celaya. Between October 2001 the fraudulent state action first amended complaint filing and its adjournment in April 2005, Plaintiffs were unaware of its existence but were harmed tremendously sustained physical, psychological, and economic injuries.

21. The Order stated that the complaint fails to identify facts....the Court does not discern where in the complaint Plaintiffs have alleged any false representation, concealment, or nondisclosure by the Homeowners Association. It also stated "A defendant's fraud in concealing a cause of action against him will toll the statute of limitations..."). **No specific fraudulent misrepresentation is alleged.**

5

1 schedules starting August 20 through September 2. Upon Defendant Zimba's subpoena
2 Plaintiffs twelve treating doctors for depositions between September 6 and 10, 2004,
3 while Rockridge Manor trial date was on September 10, 2004, and defense attorneys
4 had not taken any deposition of Plaintiffs' expert witnesses and treating doctors,
5 **Plaintiff Chang believed that the upcoming trial would be sabotaged by Plaintiffs'**
6 **attorneys and defense attorneys**, in order to keep Plaintiffs hostage **prevented from**
7 **appealing the assault/battery action judgment**, and to facilitate Defendants Zimba and
8 Coombes' continuous extortion forcing Plaintiffs to hire another team of attorneys and
9 expert witnesses to enable the appeal of sabotaged Rockridge Manor action.

10     27. Defendants Zimba and Coombes did not expect Plaintiff Chang accepting the
11 low amount of settlement from Rockridge Manor simply to protect Plaintiff Sun from
12 being further injured by these two greedy, deceitful, and despicable Defendants
13 Zimba and Coombes, who expected to have secured their 33 1/3% of Plaintiffs damage
14 award irrespective of their intended injuries against Plaintiffs in both state actions.

15     28. In the Order granting Defendants Rockridge Manor motion to dismiss and
16 summary judgment, filed on February 13, 2008, page 10, it stated "However, the
17 transcript of the trial in the (assault/battery) Celaya case, which the Court has reviewed,
18 **does not demonstrate Ms. Zimba "framed" her own client.**

19     29. Plaintiffs' complaint in this instant action No. C-07-4005 EMC, paragraphs
20 92, 93 and 94, clearly stated that Defendant Zimba knew Plaintiffs Chang and Sun were
21 being aggravated assaulted/battered by the Defendant/Assailant Celaya helplessly, and
22 at all relevant times, Plaintiff Chang was being pushed/punched/choked/choked-hold/
23 slammed against the laundryroom door/wall/locker, and Plaintiff Sun, disabled, was
24 being punched/hit/scratched up by the Defendant/Assailant Celaya. Zimba also knew
25 Plaintiffs Chang and Sun were completely defenseless being attacked by the Defendant/
26 Assailant Celaya using **police offensive skills**, and at all relevant times, Plaintiffs
27 Chang and Sun did not know how to raise hand at the Defendant/Assailant or anyone.
28     8

1 | **But Defendant Zimba made Plaintiffs the assailants in the assault/battery trial on**
2 | **August 5, 2004** – exhibits, page 81, line 6-7; page 83, line 22, 25, 27; page 85, line 22, 25;
3 | page 86, line 2; page 89, line 7, 21-22, 28; page 90, line 1, 4, 5, 9, 10-11, 13, 19-21,
4 | page 91, line 7-9, 12, 14, 23-25; page 92, line 3-4, 6-7, 9-10; page 93, line 22-23, 25,
5 | 27-28; page 95, line 2-3, 6-7, 9, 11-12, 14-15, 16-17, 19-20; page 97, line 13, 15.

6 |     30. Plaintiffs **cannot comprehend** the Court Order (page 10) stating "However, the
7 | transcript of the trial in the Celaya case, which the Court has reviewed, does not
8 | demonstrate Ms. Zimba "framed" her own client. Attached transcript exhibits.

### MEMORANDUM OF POINTS AND AUTHORITIES

10 |     31. 28 U.S.C.S. Section 144 provides in pertinent part that whenever a party to any
11 | proceeding in a district court makes and files a timely and sufficient affidavit that the
12 | judge before whom the matter is pending has a personal bias or prejudice either against
13 | him or in favor of any adverse party, such judge shall proceed no further therein, but
14 | another judge shall be assigned to hear such proceeding.

15 |     32. Under 28 U.S.C.S. Section 455(a), a judge shall disqualify himself in any
16 | proceeding in which his impartiality might reasonably be questioned.

17 |     33. In the recent Court Order granting Defendants Rockridge Manor Condominium,
18 | Homeowners Association, and Board of Directors motion to dismiss and summary
19 | judgment, it stated Plaintiffs as "fantastic conspiracy, ultimately nothing more than
20 | speculation, patently fanciful and insubstantial, fantastic or delusional scenarios, forma
21 | pauperis, so implausible fantastic, sheer speculation lacking plausibility, fantastic,
22 | speculative and implausible.

23 |     34. The Court Order dismissed Plaintiffs complaint and opposition to Defendants'
24 | dismissal and summary judgment stating Plaintiffs as either "fantastic or delusional
25 | scenarios, implausible fantastic, sheer speculation lacking plausibility", or otherwise,
26 | "No specific fraudulent misrepresentation is alleged."

27 |     35. In this instant motion for recusal, paragraphs 28-30, and attached exhibits,

9

1  which provided specific facts and evidence proving the Court has a personal bias and
2  prejudice against Plaintiffs, and in favor of adverse party in this instant action
3  No. C-07-4005 EMC.

## CONCLUSION

36. Plaintiffs Chang and Sun, mother and son, who have had experienced severe discrimination and persecutions in the Rockridge Manor Condominium community where Plaintiffs had lived nearly 13 years. Plaintiffs had done no harm to anyone in the community and often lend a helping hand to all our community families.

37. Because the Rockridge Manor Condominium's Manager, President, and Board of Directors' greed and personal gains; they discriminated, persecuted, and aroused hatred against Plaintiffs causing psychological, physical, and economic injuries.

38. When Plaintiffs sought legal action against these Rockridge Manor Individual Defendants, somehow these Defendants were able to undermine Plaintiffs in every aspects, including manipulating and controlling all Plaintiffs' attorneys turning Plaintiffs cause of actions against Plaintiffs.

39. Plaintiffs Chang and Sun are average citizens who have no fame, power, or significant background, and are **completely shocked to this date** at the disparage treatments including aggravated assault/battery, being extorted and defeated at every legal proceedings by Plaintiffs' own attorneys, and losing our home where we planned to live our whole lives.

40. Plaintiff Chang is no where near to be a **fantastic conspiracy, ultimately nothing more than speculation, patently fanciful and insubstantial, fantastic or delusional scenarios, forma pauperis, so implausible fantastic, sheer speculation lacking plausibility, fantastic, speculative and implausible "person"**, as the Court has stated in the Order. And there has had no one ever think of Plaintiff Chang as such person as the Court has stated.

10

1  41. Although Plaintiff Chang is aware that the Defense Attorneys would very
2  much like to paint that picture as who Plaintiff Chang is.
3  42. Plaintiffs have great hope in this instant action to find justice, remedy, and
4  most of all, answers as to why all Plaintiffs' attorneys extorted legal fees and
5  sabotaged against Plaintiffs' cause of actions aiding and abetting Defendants.
6  43. Plaintiffs have provided specific facts and relevant evidence for Court's
7  recusal and another assigned judge to hear the instant action proceedings.

Dated: March 24, 2008

*Christine Chang*

Christine Chang, Plaintiff

11

## CERTIFICATE OF SERVICE

I, CHRISTINE CHANG, hereby certify that on March 24, 2008, I forwarded a true and correct copy of:

1. Plaintiffs motion for Judge Chen's recusal
2. Affidavit of Plaintiffs in support of motion for recusal
3. Declaration of Plaintiff Chang in late service of Defendant Eva Ammann

to Defendants' Counsels by placing a true copy and thereof in a sealed Envelope with first class postage prepaid and addressed as follows:

Gaylynn Kim Conant
Lombardi, Loper & Conant, LLP
Lake Merritt Plaza
1999 Harrison Street, Suite 2600
Oakland, CA 94612-3541

Paul A. Conroy
Allman & Nielsen
100 Larkspur Landing Circle
Suite 212
Larkspur, CA 94939

Lee J. Danforth
Coddington, Hicks & Danforth
555 Twin Dolphin Drive, Suite 300
Redwood Shores, Redwood City,
California 94065-2133

Andrew Adler
Boornazian, Jensen Garthe
555 12th Street, Suite 1800
Oakland, CA 94607

Albert F. Coombes
15915 Ventura Blvd., Penthouse 4
Encino, CA 91436

Edward Rodzewich
Valvrian, Patterson and Stratman
1650 Harbor Parkway, Suite 100
Alameda, CA 94502

I caused such envelopes to be placed for collection and mailing in the United States Mail at San Francisco, California.

Dated: March 24, 2008

By _____
Christine Chang, Plaintiff

EXHIBIT

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

BEFORE THE HONORABLE CECILIA CASTELLANOS, JUDGE

DEPARTMENT NO. 18

---oOo---

CHRISTINE CHANG AND ERIC SUN,           NO. 2002046048

   Plaintiff,

vs.

CONSTANCE PEPPERS CELAYA,

   Defendant.
_____/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

ADMINISTRATION BUILDING
ALAMEDA COUNTY
OAKLAND, CALIFORNIA

AUGUST 5, 2004

APPEARANCES:

FOR THE PLAINTIFFS:    LAW OFFICE OF PAMELA ZIMBA
                       110 East D Street, Suite A
                       Benicia, California

FOR THE DEFENDANT:     CONSTANCE CELAYA
                       In Propria Persona

TINA MARIE McCONNELL, CSR #11917

---

I N D E X
---oOo---

**WITNESSES**

**CHRISTINE CHANG**

| | |
|---|---|
| DIRECT EXAMINATION BY MS. ZIMBA | 8 |
| CROSS-EXAMINATION BY MS. CELAYA | 35 |
| REDIRECT EXAMINATION BY MS. ZIMBA | 43 |
| RECROSS-EXAMINATION BY MS. CELAYA | 46 |
| FURTHER RECROSS-EXAMINATION BY MS. CELAYA | 62 |
| FURTHER REDIRECT EXAMINATION BY MS. ZIMBA | 63 |

**ERIC SUN**

| | |
|---|---|
| DIRECT EXAMINATION BY MS. ZIMBA | 65 |
| CROSS-EXAMINATION BY MS. CELAYA | 69 |

**CONSTANCE PEPPERS CELAYA**

| | |
|---|---|
| DIRECT EXAMINATION | 73 |
| CROSS-EXAMINATION BY MS. ZIMBA | 76 |

TINA MARIE McCONNELL, CSR #11917

---

1

P R O C E E D I N G S

August 5, 2004

---oOo---

THE COURT: Good morning, everyone. Let's get on the record. Calling the matter of Chang and Sun versus Constance Celaya, 2002-046048. This matter is on for a court trial. Representing the plaintiffs.

MS. ZIMBA: Pamela Zimba.

THE COURT: Representing Ms. Celaya.

MS. CELAYA: Constance Celaya.

THE COURT: Ms. Celaya is in pro per. And I understand that certain documents were filed this morning. I didn't see the plaintiffs' trial management statement, and I understand you all have filed exhibits or have presented the clerk with some exhibits. Are the plaintiffs ready?

MS. ZIMBA: Yes, Your Honor.

THE COURT: Are you ready, Ms. Celaya?

MS. CELAYA: Yes, ma'am.

THE COURT: All right. Did you wish to make an opening statement, Ms. Zimba?

MS. ZIMBA: Yes. Just a brief one, Judge.

THE COURT: All right. Go ahead, please.

MS. ZIMBA: On Monday, December 10th, 2001, Christine Chang and Eric Chang were assaulted by the defendant, Constance Celaya. The assault occurred in the laundry room at the Rockridge Manor Homeowners' Association.

The laundry room was on the third floor of the complex and adjacent to unit number 313. Unit number 313 is

TINA MARIE McCONNELL, CSR #11917

---

2

the unit that the plaintiffs, Christine Chang and her son Eric Sun lived in while they lived at the complex.

Christine Chang will testify that it was just the defendant Constance Celaya and herself that were in the laundry room for a large portion of the assault. She will also tell you that it was the defendant, Constance Celaya who initiated the assault.

What we're here today to have you determine, Judge, is not so much a question of who it was that initiated the assault as much as it is a question of whether the defendant used excessive force under the circumstances, whether or not that excessive force was reasonable under the circumstances, whether or not the defendant's actions were the direct and/or the proximate cause of the plaintiffs' injuries, and whether or not the plaintiff, Christine Chang suffered both physical and emotional injuries as a result of the assault. And although Eric Sun suffered only minor physical injuries, he did suffer emotional distress, and he will testify to that.

Christine Chang will testify that she went into the laundry room at approximately 8:30 at night, that she put her wash in the machines, realized she didn't have quarters, went back to her unit which was directly next door, was getting quarters out of her room, heard a lot of banging going on in the laundry room, raced back into the laundry room only to find that her wash had been taken out of the laundry, out of the washing machines, put on top, somebody else's wash was in the machines, and the machines were

TINA MARIE McCONNELL, CSR #11917

75

         And then a couple minutes later, the door opened and
her son came in and he grabbed me.  So now I had her over
here and him over here and they were both pulling on me.  He
was hitting on me and he was pulling on me and I was in
there alone.  I was there all by myself and these two people
were basically hitting me.
         And then the door opened again a few minutes later
and Mr. Bailey came in.  Mr. Bailey lives -- the laundry
room is like this.  He lived up the stairs there to the
side.  And he said:  What are you guys doing?  Stop.  This
is ridiculous.  And he separated everybody.
         And I was really, really out of breath.  I was really
winded and I said:  I need to call the police.  Call the
police.  And then his wife got the phone, cordless phone,
and I called 911 and then we waited for the police to come.
         We were all standing in the -- as you're outside the
laundry room right next to that, there is the elevator door.
And then you go up three stairs, four stairs, and there are
two more condominiums.  And I was standing up on that level
near the Baileys, and she was down on the level where the
door is to the laundry room.
         And then she ran back in the laundry room and grabbed
my clothes and started throwing them over the back of the
washer.  And Mr. Bailey went in and said:  Stop.  Stop.
That's stupid.  Don't do that.  And then his wife went and
called the police again and said this thing is still going
on.  We need the police as soon as possible.
         Then the police came and they asked what was

76

happening, and I don't personally recall which officer went
where, I just know the officers went to each person and
asked what was going on.  And she was screaming, and I don't
mean to sound weird about this but she said:  She
policewoman.  She policewoman.  She scratch me.  Scratch me.
And she went like that on her.
         And I said:  I am not a police officer.  And I said:
She hit me and I hit her back.  And they, you know, they
asked more questions and they took me back to my condo down
the hall.  And one of the officers, again I don't remember
which, said:  Look, if we come back out here again, someone
is going to get arrested.  We don't want you to get in
trouble and get fired from your job, and they left and that
was that.
         The next thing I knew, which was really -- I sat down
in my living room which was -- I just, I was appalled.  The
whole situation was appalling.
         In the line of work I have, I have trust and I
have -- I don't do criminal acts.  I try to stay very clean
in my community and I try to get along with my neighbors,
but I don't believe in just getting pelted either.  You hit
me, it's self-defense.  And that's basically what happened
that night.
         THE COURT:  All right.  Ms. Zimba, you want to
question Ms. Celaya.
         MS. ZIMBA:  I do have questions, Judge.
                     CROSS-EXAMINATION
Q.  BY MS. ZIMBA:  Ms. Celaya, when you went into the

77

 1  laundry room the first time and you saw the clothes in the
 2  washing machine, did you know whose clothes those were?
 3  A.  No.
 4  Q.  You had no idea?
 5  A.  No.
 6  Q.  And there were clothes in both of the washing
 7  machines.  Correct?
 8  A.  I believe so, but I couldn't say I really recall
 9  that.  I don't know.
10  Q.  You've testified that after you saw the clothes in
11  the machine, you went back to your unit, waited the 15
12  minutes, and then came back into the laundry room.  Right?
13  A.  That's correct.
14  Q.  When you came back into the laundry room the second
15  time, you still saw clothes in the washing machine.  Right?
16  A.  Correct.
17  Q.  Did you recognize those as being the same clothes
18  that had been in the machines when you came in the first
19  time?
20  A.  Yes, they were.  Yes.
21  Q.  How could you tell that they were the same clothes?
22  A.  Same colors.  Same patterns.
23  Q.  Had you looked at the clothes?
24  A.  I looked at them because you open the door to put
25  clothes in and you see clothes.
26  Q.  So you did believe that those were the clothes that
27  had been in the machines when you came, when you were there
28  the first time?

78

 1  A.  Correct.
 2  Q.  So it was getting -- what time was it when you came
 3  into the laundry room the second time to put your clothes in
 4  the machine?
 5  A.  Fifteen minutes later.  All I know is on the clock.
 6  Maybe a quarter to 9, 10 to nine.  I don't know.
 7  Q.  What time does the laundry room close?
 8  A.  At 11.  Your clothes should be through by 11.
 9  Q.  Whose clothes were you washing that night?
10  A.  My son's.  He was in middle school at the time.
11  Q.  And this was a school night.  Correct?
12  A.  I don't recall.
13  Q.  Did you need these clothes for the next day?
14  A.  Yes.  Every time I wash, I need the clothes, yes.
15  Q.  So you needed the clothes for the next day?
16  A.  Right.
17  Q.  So is it fair for me to say that at this point, at
18  approximately 10 minutes to 9 on a school night, that you
19  were rushed to get your laundry done before the
20  11:00 o'clock cutoff point?
21  A.  Well, if I didn't get them washed, I always have
22  clothes in the closet.  I mean we can, I can think of other
23  things to do.  But yes, I would want to wash the clothes,
24  yes.
25  Q.  Your son at that time was going to a school that
26  required him to wear a uniform; is that correct?
27  A.  Correct.
28  Q.  So you were washing his uniforms; is that right?

79

```
 1  A.    Correct.
 2  Q.    Did you have extra uniforms available for him to wear
 3  the next day?
 4  A.    I usually have at least one set or have one set.
 5  Q.    Did you have extra uniforms available?
 6  A.    I couldn't recall, ma'am. I don't know.
 7  Q.    So you put your laundry in the two machines; is that
 8  right?
 9  A.    Correct.
10  Q.    So you were using both of the machines at that point?
11  A.    Correct.
12  Q.    You had taken Christine's laundry out of two machines
13  and put them on top of the washers?
14  A.    I took clothes out of the machine and put them on pop
15  of the machines. That's correct.
16  Q.    At that point, you didn't know whose clothes those
17  were?
18  A.    No, I didn't.
19  Q.    Once you put the clothes in the machines, you started
20  the machines and then you left the laundry room. Correct?
21  A.    That is correct.
22  Q.    And how long were you gone once you put the clothes
23  in?
24  A.    Forty minutes.
25  Q.    So when you came back to the laundry room to check on
26  your wash, what time was it?
27  A.    Forty minutes after the time I put it in. I don't
28  know what time it was. But whenever I got back, I looked at
```

80

```
 1  the time on the clock and then I know what 40 minutes is
 2  from there and I go down the hall.
 3  Q.    So you testified that you came in, put your laundry
 4  in the machine at around 10 minutes to nine. Right?
 5  A.    Right. 9:30 maybe.
 6  Q.    So about 9:30, you're back in the laundry room. And
 7  what do you find when you come into the laundry room?
 8  A.    My wet clothes on the floor.
 9  Q.    Were your wet clothes on the floor from both of the
10  machines or just one of the machines?
11  A.    I believe one machine. I believe one.
12  Q.    Were there any clothes left in the machine that was
13  open?
14  A.    Maybe a couple pairs of pants.
15  Q.    When you saw that your clothes had been taken out of
16  the machine, did you know who had done that?
17  A.    No.
18  Q.    Did you have any suspicions as to who had done that?
19  A.    No.
20  Q.    Did you have any reason at that point to suspect that
21  Christine Chang had come in and taken your clothes out?
22  A.    No.
23  Q.    Did you ever have that happen to you before?
24  A.    No.
25  Q.    So as I understand it, Christine Chang came back,
26  came into the laundry room while you were picking up your
27  clothes; is that right?
28  A.    That's correct.
```

81

```
 1  Q.    It's your testimony that she started to pull your
 2  clothes --
 3  A.    Out of my hands.
 4  Q.    -- out of your hands?
 5  A.    Correct.
 6  Q.    Was she grabbing your clothes or was she grabbing
 7  your hands?
 8  A.    She was grabbing the -- for instance, I had the
 9  clothes and she was trying to pull the clothes out of my
10  hand.
11  Q.    What did she say to you?
12  A.    I really don't remember what she said. She was
13  speaking in loud tones and with an angry voice. I can't
14  remember word for word what she said. Basically something
15  about her wash.
16  Q.    Did Christine ask you: Why did you take my clothes
17  out of the laundry?
18  A.    If she did, I can't recall that conversation because
19  she was screaming so loudly, and at that point we were
20  pushing each other.
21        At that point, the laundry was the least of the
22  situation because now we have an altercation going on.
23  Q.    And Ms. Celaya, when you came into the laundry room
24  and saw the clothes in the machine the first time, why
25  didn't you just go downstairs to a different laundry room?
26  A.    I never go to another floor, because each floor has
27  the same amount of people on them and everybody usually
28  washes their clothes certain days. I usually just wait. So
```

82

```
 1  I waited my 15 minutes and came back and they were still in
 2  the same -- not wet. Still sitting there. So I just took
 3  them out.
 4  Q.    Did you go down to -- you live on the third floor.
 5  Right?
 6  A.    That's correct.
 7  Q.    And there's three floors in this condominium complex?
 8  A.    That's correct.
 9  Q.    Did you go down to the first floor to see if the
10  laundry room was available?
11  A.    I never go to other floors to wash.
12  Q.    You did not go to the first floor?
13  A.    I did not. I never go to the first floor.
14  Q.    You didn't go to the second floor?
15  A.    As I stated, I never go to the second floor to wash.
16  I always wash on the floor I live on.
17  Q.    When Ms. Chang came into the laundry room, were you
18  at that point angry enough to hit someone?
19  A.    No. I have never been angry enough to hit anyone.
20  You can always talk about something. I work in law
21  enforcement. I know what it means to have charges filed. I
22  take 911 calls all day long. I don't think there is ever
23  any reason to hit someone unless it's in self-defense.
24  Q.    And you work as public dispatcher; is that right?
25  A.    Public safety dispatcher.
26  Q.    As a public safety dispatcher, what was your
27  training?
28  A.    How to handle emergency calls. How to deal with
```

83

```
 1  people who are upset, either on the phone or at the front
 2  counter.
 3          I deal with a lot of homeless people. I deal with a
 4  lot of people who have mental disabilities. I deal with a
 5  lot of people who are angry because they get tickets. And
 6  one of my jobs is to try to solve those problems, and it's
 7  not in a physical manner.
 8  Q.  So is it fair to say that at the time Christine came
 9  into the laundry room the first time, she was upset?
10  A.  Yes.
11  Q.  Did you recognize her as being upset at that point?
12  A.  Well, I didn't really look in her face. I said: Hi,
13  Christine. And when she grabbed the clothes, obviously she
14  was upset.
15  Q.  You knew she was upset?
16  A.  At that point.
17  Q.  Did you try to talk her down?
18  A.  I said to her: What are you doing? Basically, what
19  are you doing, leave me alone. When she pushed me, I was:
20  Go away. Leave me alone. And then when she hit me, she hit
21  me.
22  Q.  Where did she hit you, Ms. Celaya?
23  A.  She pushed me against the wall, and then she hit me
24  in my shoulder right here.
25  Q.  Did she hit you with her fist or her hand?
26  A.  I don't recall.
27  Q.  Were you hurt as a result of that?
28  A.  It was discomforting but not hurt.
```

TINA MARIE McCONNELL, CSR #11917

84

```
 1  Q.  My understanding is that at some point you grabbed
 2  Christine; is that correct?
 3  A.  That is correct.
 4  Q.  And where did you grab her?
 5  A.  I grabbed her by the front of her shirt, and I said
 6  get out of here and leave me alone, grabbed her by the front
 7  of her shirt, pulled the door open, and pushed her out.
 8  Q.  Okay. So when you grabbed her by the shirt, where
 9  was she standing at that point? Was she in front of the
10  door?
11  A.  She was in front of the door.
12  Q.  Which way did the door open?
13  A.  The door opens into the laundry room.
14  Q.  So it opened toward you. Correct?
15  A.  Um-hmm.
16  Q.  And you're left-handed. Right?
17  A.  That's correct.
18  Q.  So when you pulled the door open, what hand did you
19  use to pull the door open?
20  A.  The right hand and shoved her out.
21  Q.  So you pulled the door open with your right hand.
22  Then you must have been holding Christine with your --
23  A.  I was holding on her shirt.
24  Q.  -- holding her with the left hand?
25  A.  Um-hmm.
26      THE COURT: Don't talk over each other.
27  Q.  BY MS. ZIMBA: Did you pull Christine toward you?
28  A.  To get the door open?
```

TINA MARIE McCONNELL, CSR #11917

85

```
 1  Q.  Yes.
 2  A.  I kind of had her like this and pushed her to the
 3  side, opened the door, and pushed her out.
 4  Q.  And you pushed her out the door with your left hand?
 5  A.  Right. And closed the door.
 6      THE COURT: Is the door locked at that point?
 7      THE WITNESS: Yes. It locks from the -- yes. You
 8  need a key to get back in.
 9  Q.  BY MS. ZIMBA: From the outside. Correct?
10  A.  Correct.
11  Q.  Ms. Celaya, in your deposition that was taken in
12  September of 2003 -- do you remember having your deposition
13  taken?
14  A.  I remember the deposition.
15  Q.  At that point, Ms. Chang and Mr. Sun were represented
16  by a different attorney; is that correct?
17  A.  Um-hmm.
18  Q.  That was Mr. Sirota at that point?
19  A.  (Witness shrugs.)
20  Q.  In your deposition, on page 36 you testified that --
21  this is page 36 line number 1 -- you testified: As of that
22  point, because she was all over me, I grabbed the door, I
23  grabbed her, and I pushed her out and the door closed. I
24  proceeded to pick up my clothes.
25      Is that right?
26  A.  Yes.
27  Q.  And on page 44 of the deposition, in reference to the
28  same moment when you are holding Ms. Chang with your left
```

TINA MARIE McCONNELL, CSR #11917

86

```
 1  hand, you then testified, and this is on lines three through
 2  7: Let me see the sequence. When she grabbed me, I guess I
 3  threw the clothes down. I don't, I don't know how that
 4  went. And then I just grabbed her back and shoved her as
 5  hard as I could against the door, opened the door, and
 6  shoved her out.
 7  A.  Um-hmm.
 8  Q.  Is that correct?
 9  A.  That's correct.
10  Q.  So which is it, Ms. Celaya? Is it that you grabbed
11  her and pushed her out the door, or is it you grabbed her as
12  hard as you could and you shoved her out the door?
13  A.  I don't see any difference there. I grabbed her and
14  I shoved her out the door.
15  Q.  But according to your testimony on page 44, you
16  shoved her: As hard as I could against the door, opened the
17  door, and shoved her out. Is this testimony incorrect?
18  A.  I see what you're saying in terms of the sequence.
19  It's been a long time. But I did shove her. I don't know
20  if she went against the door or if the door opened.
21  Whatever it says there. But I did shove her out as hard as
22  I could.
23  Q.  Did you believe at that point that you had hurt
24  Ms. Chang?
25  A.  No.
26  Q.  Did you think you hurt Ms. Chang when you shoved her
27  out the door?
28  A.  No.
```

TINA MARIE McCONNELL, CSR #11917

87

```
 1  Q.    Did you think you hurt Ms. Chang when you shoved her
 2  against the door as hard as you could?
 3  A.    No, because she came back.
 4  Q.    Did you care if you hurt Ms. Chang, Ms. Celaya?
 5  A.    Of course I did, but I also cared if I got hurt.
 6  Q.    Is it fair to say, Ms. Celaya, that you must be
 7  pretty strong to have been able to shove Christine up
 8  against the door as hard as you could and open the door with
 9  your right hand and shoved her out the door as hard as you
10  could; is it fair to say you must be pretty strong?
11  A.    Not really.  When you're in a situation like that,
12  you get an adrenaline rush and fear kicks in, and I probably
13  was just as afraid as she was and I felt I was being
14  attacked and I was doing self-defense and I did whatever I
15  could to get her off me and get her out of the room.
16  Q.    Were you at that point, when you were shoving
17  Ms. Chang out the door, were you afraid of Ms. Chang?
18  A.    Was I afraid of Ms. Chang?  Not necessarily afraid of
19  her, the person, but the situation.  And at that point, you
20  know, how did we even get into this situation?  I am a grown
21  woman.  I work for law enforcement.  This is not my
22  demeanor.  This is not what I do.  I don't touch people.  It
23  was just totally over the top.  So at that point, it was
24  more just disgust.
25  Q.    So at that point when you shoved Ms. Chang out the
26  door, you were not afraid of Ms. Chang, were you?
27  A.    Not anymore.  No.  She was gone.
28  Q.    At the moment when you were still inside and
```

88

```
 1  Ms. Chang was still inside the laundry room and you are
 2  opening the door with your right hand and you're shoving her
 3  out with your left hand, were you at that point in time
 4  afraid of Ms. Chang?
 5  A.    I was afraid of the situation because I know that
 6  what happens, what the consequences of these kinds of
 7  situations are, especially for me in the kind of job that I
 8  hold.  Especially after she hollered:  You're trying to kill
 9  me.  You're trying to kill me.  That just lent itself to a
10  whole lot of things in my mind what could go on here.
11        I wanted her away from me.  Out of where I was.  Go
12  back to where you live, I will get my clothes, and I will go
13  to where I live.  Let's be away from each other.
14  Q.    So it wasn't so much that you were afraid of
15  Ms. Chang at that point.  It was more that you had these
16  thoughts going through your mind about what could happen?
17  A.    After the initial situation and she was hitting me
18  and I was hitting her and she was screaming, all I wanted
19  her to do was go away.
20  Q.    And this is when she's come into the laundry room the
21  first time?
22  A.    This is the first time, because I was trying to get
23  her off of me and I said:  Go away.  Leave me alone.
24  Q.    My question still is:  Were you afraid of Ms. Chang
25  or were you more afraid of what you believed would be the
26  potential repercussions from this incident?
27  A.    I would say they were equal.
28  Q.    So are you now saying you were afraid of Ms. Chang?
```

89

```
 1  A.    I am -- I was afraid of what was going on there.
 2  She's, she was acting in an irrational manner.  You really
 3  can't -- I'm not a shrink or anything like that, but when
 4  people are going off, yes you are afraid in that sense.  I'm
 5  not afraid of her as a person, but I'm afraid of what is
 6  going on in her mind and the volatility of the situation.
 7  Q.    Did you fear for your life at that point?
 8  A.    Not at that point.  I was afraid when both of them
 9  were in the room and I was alone.
10  Q.    I'm asking you about --
11  A.    Not at that moment, no.
12  Q.    At the moment when you shoved her out the door as
13  hard as you could, were you afraid of Ms. Chang?
14  A.    No.  I shoved her out as hard as I could so she would
15  go away and leave me alone.
16  Q.    Do you think there was perhaps another way you could
17  have had her leave the laundry room other than to shove her
18  out the door as hard as you could?
19  A.    That might have been possible if she hadn't been
20  hitting me.
21  Q.    So are you saying that at the moment in time that you
22  shoved her out the door, she was hitting you?
23  A.    No.  By that time I had gotten her -- she had hit me
24  so many times.  By that time, I had gotten her to a distance
25  that I just pushed her out.  Because she's taller than I am.
26  She's got longer arms.  She has longer legs.  She has a
27  longer reach.
28  Q.    How many times did she -- according to you, how many
```

90

```
 1  times did she hit you this first time?
 2  A.    Enough that it was to get her out and get her off of
 3  me.  Once is too much, ma'am, but she hit me more than once.
 4  Q.    Okay.  I thought you had testified just a few minutes
 5  ago that she hit you once on your shoulder?
 6  A.    She hit me here -- your question was where did she
 7  hit you.  She hit me a number of times, but the initial
 8  thing I felt was in my shoulder.
 9  Q.    So you're saying that there were additional times
10  when you're in the laundry room the first time when
11  Ms. Chang hit you?
12  A.    Um-hmm.
13  Q.    How many times did she hit you?
14  A.    I cannot tell.  When she hit me, she grabbed me.  She
15  was trying to lock up my arms and stuff like that.  She
16  would not get off me.  I kept saying:  Leave me alone.
17  Leave me alone.  Go away.  There is no way I could tell you
18  how many times she hit me.
19  Q.    At the time you shoved her out the door, I believe
20  it's your testimony that she was not hitting you at that
21  point?
22  A.    Not at that moment.  Not when I had her like that.
23  Q.    Did you go to the doctor?
24  A.    No.
25  Q.    Did you think you needed to go to the doctor?
26  A.    No, ma'am.
27  Q.    So after you shoved Christine out the door, what
28  happened?
```

91

```
1   A.   I went about the business of trying to pick up my
2   clothes and find out what I had left to do, what was going
3   to happen.
4        And then she came back in and she just started
5   hitting me again, and two minutes later her son came in
6   there.  Now there were three of us in there.
7   Q.   So when Ms. Chang comes back in the laundry room, the
8   very first thing she does, according to your testimony, is
9   she just started hitting you?
10  A.   Yes.  There was no discussion.  She did not try to
11  talk to me or reason with me or any of that kind of stuff.
12  Q.   How did she hit you?
13  A.   With her hand.
14  Q.   With her hand or her fist?
15  A.   With her hand.  She was -- she, you know, tried to
16  grab my clothes and I tried to push her off.  And then there
17  were some keys somewhere.  I don't know if they were mine or
18  hers, and we started going all the way around this small
19  square room, you know, holding onto each other -- two
20  dryers, two washers, the door, the garbage chute -- just
21  going around this room.  And then I heard the door open
22  again, and it was her son.
23  Q.   Did you at any point in time while you were engaging
24  in this altercation with Ms. Chang, did you at any point in
25  time, at this point stop?
26  A.   What do you mean by "stop?"
27  Q.   Did you just stop hitting her?
28  A.   So she could hit me?
```

TINA MARIE McCONNELL, CSR #11917

92

```
1   Q.   I'm asking if you stopped hitting her?
2   A.   No.  Not after she was hitting me.  No.
3   Q.   There wasn't any point during this portion of the
4   altercation that you even attempted to stop?
5   A.   No.
6   Q.   Did you at any point in time think Ms. Chang was
7   perhaps defending herself?
8   A.   No, because she hit me first.
9   Q.   Did you think at any point in time that Ms. Chang was
10  simply trying to get you off of her?
11  A.   No.
12  Q.   You've indicated that you were hitting Ms. Chang; is
13  that right?
14  A.   We were hitting each other.
15  Q.   You've indicated in your testimony, Ms. Celaya, that
16  you hit Ms. Chang; is that right?
17  A.   In self-defense.  Correct.
18  Q.   Would you describe for the Court how hard you think
19  you hit Ms. Chang?
20  A.   Hard enough so hopefully she would leave me alone.
21  Q.   Did you hit her with your first or with your hand?
22  A.   I'm sure I hit her with both.
23  Q.   You did at some point in time hit Ms. Chang with a
24  closed fist; is that right?
25  A.   I'm sure I did.
26  Q.   Where did you -- where on Ms. Chang's body did you
27  hit her?
28  A.   I couldn't testify to that.  All I know is I was
```

TINA MARIE McCONNELL, CSR #11917

93

```
1   hitting her body.  I have no clue as to what parts of her
2   body.  I have no idea.  I was just hitting her.
3        As I said, she's taller than I.  She was all over me
4   like this, and I was trying to have her leave me alone.
5   Q.   In your job as a police dispatcher -- how long have
6   you been in that job?
7   A.   Almost 27 years.
8   Q.   Did you at some point in time receive training to
9   become a police officer, a public dispatcher?
10  A.   Yes.
11  Q.   Did you receive any type of judo or karate-type
12  training as a part of your job?
13  A.   No.
14  Q.   Did you receive any type of techniques training and
15  techniques in terms of handling people in difficult
16  situations?
17  A.   Yes.  About 20 years ago.
18  Q.   Have you ever updated that training since then?
19  A.   No.
20  Q.   In your deposition, Ms. Celaya, on page 56 you say
21  on -- on line 1 you say:  No, I hit her again.
22       And then the question is:  Okay.  Did you attempt to
23  block her striking you on the left clavicle?
24       Answer, your answer:  Yeah.
25       Question:  How did you try to block her?
26       Answer:  With an arm bar.  You know, I put my arm up.
27       And then on line 21 the question is:  Okay, so your
28  recollection would be that it was your left hand?
```

TINA MARIE McCONNELL, CSR #11917

94

```
1        Answer:  99 percent probably, yes.
2        Question:  Clenched?
3        Answer:  Oh, yeah.  A fist.
4        THE COURT:  Ms. Zimba, if you want to read a little
5   more, but we're going to take our lunch break soon.
6        MS. ZIMBA:  I'm almost finished, Judge.
7        THE COURT:  You are.
8        MS. ZIMBA:  Should we just take our break?
9        THE COURT:  You want to continue?
10       MS. ZIMBA:  Yes.
11       THE COURT:  How much longer?
12       MS. ZIMBA:  I would say probably 10 minutes.
13       THE COURT:  No.  Let's break.  Let's break.  And if
14  you could come back at two, then we'll pick up with
15  Ms. Celaya.  I have some questions of Ms. Celaya, and then
16  it will give time for the doctor to arrive.  Okay.
17       (Recess.)
18                      AFTERNOON SESSION
19       THE COURT:  All right.  Ms. Celaya, you want to come
20  back up, please, and you're still under oath.  All right.
21       THE WITNESS:  Yes, ma'am.
22       THE COURT:  Go ahead.
23  Q.  BY MS. ZIMBA:  Ms. Celaya, I want to refocus your
24  attention.  When Christine came back in the laundry room the
25  second time, where were you standing at that point when she
26  came into the room?
27  A.   I think I was standing in front of the dryers.
28  Q.   And how far away from the door were the dryers?
```

TINA MARIE McCONNELL, CSR #11917

95

```
 1  A.    Maybe two steps, three steps.
 2  Q.    So is it your testimony that Christine just walked
 3  into the laundry room and walked over to you and hit you?
 4  A.    She walked in, she continued screaming, and she
 5  pushed me and started hitting me.
 6  Q.    And when she pushed you and started hitting you, did
 7  you land up against anything in the laundry room?
 8  A.    I fell back against the west wall.
 9  Q.    And when she pushed you, what did you then do?
10  A.    Pushed her back. I mean the fight ensued again.
11  Q.    Did you have an opportunity at that point to refrain
12  from pushing her back?
13  A.    No.
14  Q.    So you don't think that at that point in time when
15  Christine allegedly came in and pushed you that you could
16  have stopped the fight at that point by simply not pushing
17  back?
18  A.    No.
19  Q.    And then after she pushed you and you pushed her, did
20  you then start hitting her?
21  A.    She was hitting me and I was hitting her back.
22  Q.    You were hitting her with both an open fist and a
23  closed fist; is that right?
24  A.    I was hitting her with whatever. Maybe open hand.
25  Maybe closed. I don't know. At that point I know we were
26  hitting each other.
27  Q.    Did you hit her with an open hand?
28  A.    I'm sure I did.
```

TINA MARIE McCONNELL, CSR #11917

96

```
 1  Q.    Did you hit her with your fist?
 2  A.    Possibly. I can't say for sure. Possibly.
 3        At that point once she came back in the room for a
 4  second time and we got into it, I realized that she wasn't
 5  just going to go away. I mean she came back into that room
 6  and started hitting me.
 7  Q.    Would you describe for me how hard you hit her?
 8  A.    I have no idea about how hard I hit her. I knew I
 9  hit her hard enough to make her go back, but then she kept
10  coming on so we were basically doing this.
11  Q.    You mentioned this morning that there were some keys.
12  When you came into the laundry room initially, did you have
13  keys in your possession?
14  A.    Yes. That's the only way to get in there.
15  Q.    Did you notice whether Christine had any keys with
16  her?
17  A.    She had to, to get into the room.
18  Q.    Did you see keys in her possession?
19  A.    Did I see them in her hand? No. But that would be
20  the only way she could get into the room because it's
21  locked.
22  Q.    But you did not see them in her hand. Right.
23  A.    No.
24  Q.    Where were your keys?
25  A.    My keys were in the cubbies, the door that you get
26  your laundry detergent and whatever else out of.
27  Q.    I believe you mentioned earlier today that you
28  thought there were keys involved at the time that you were
```

TINA MARIE McCONNELL, CSR #11917

97

```
 1  fighting with Christine?
 2  A.    Um-hmm.
 3  Q.    Whose keys were those?
 4  A.    Maybe hers because mine were in the door. I can't
 5  say for sure.
 6  Q.    You don't know?
 7  A.    No, but in order to get in, you need keys. Everybody
 8  needs their own key to get in.
 9  Q.    When you were hitting Ms. Chang with your hand, how
10  many times did you hit her?
11  A.    I have no idea. I just, every time she hit me, I hit
12  her. I was defending myself against her.
13  Q.    Were you defending yourself or were you hitting her?
14  A.    I was defending myself against her hitting me.
15  Q.    By hitting her back?
16  A.    That's correct.
17  Q.    And were you hitting her with your left hand? Your
18  right hand?
19  A.    Probably with both hands.
20  Q.    And then at some point did you start hitting her with
21  your fists?
22  A.    I can't say for sure. She hit me a couple times with
23  her fists, so maybe.
24  Q.    How hard would you say that you were hitting
25  Ms. Chang when you were hitting her with either your hand or
26  your fist?
27  A.    I don't know how to measure that.
28  Q.    Well, can you tell me in your own words how hard you
```

TINA MARIE McCONNELL, CSR #11917

98

```
 1  think you were hitting her?
 2  A.    I was hoping I hit her hard enough to make her back
 3  up and leave me alone and not hit me again.
 4  Q.    How hard was that?
 5  A.    I can't measure that. I don't know.
 6  Q.    Back to your deposition testimony on the page 56 line
 7  21, line 20. You say you're left handed. And on line 21
 8  the question is: Okay, so your recollection would be that
 9  it was your left hand?
10        Your answer: Ninety-nine percent probably, yes.
11        Question: Clenched?
12        Answer: Oh, yeah. A fist.
13        Does that help refresh your memory that you did hit
14  her with your fist?
15  A.    As I said, I probably hit her with an open hand and a
16  fist. I mean it was a fight. It wasn't like two
17  10-year-olds going like this. It was two grown women, one
18  who was attacking me who was much taller than I and pushed
19  me up against the wall. I pushed her out. She came back
20  in. The second time she came in, that's totally attacking
21  me. That's a whole other issue.
22  Q.    Page 57 of your deposition testimony on line 19 it
23  says: So during this period of time, you hit her as often
24  as you could?
25        Answer on line 21: As much as I could get hits in
26  since she was still all over me and not leaving me alone.
27        Question: And you hit her as hard as you could?
28        Answer: Hopefully, yes.
```

TINA MARIE McCONNELL, CSR #11917